**IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT**

| | | |
|---|---|---|
| _____ | ) | |
| THE PEOPLE OF THE STATE OF MICHIGAN, | ) | |
|     *Petitioner*, | ) | DOE Order No. 202-25-12 |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES DEPARTMENT OF ENERGY | ) | Case No. 26-1077 |
| and CHRIS WRIGHT, Secretary, | ) | |
| UNITED STATES DEPARTMENT OF ENERGY, | ) | |
|     *Respondents*. | ) | |
| _____ | ) | |

## PETITION FOR REVIEW

Pursuant to Rule 15 of the Federal Rules of Appellate Procedure, Circuit Rule 15, and section 313 (b) of the Federal Power Act, 16 U.S.C. § 825*l*(b), Michigan Attorney General Dana Nessel, on behalf of the People of the State of Michigan, hereby petitions the Court for review of Order No. 202-25-12 of Respondents, the United States Department of Energy, and Chris Wright, Secretary, United States Department of Energy, issued on December 23, 2025 ("the Schahfer Order," attached as Exhibit A). The Department of Energy issued Order No. 202-25-12 pursuant to section 202(c) of the Federal Power Act, 16 U.S.C. § 824a(c), a provision initially vested in the Federal Power Commission that was assigned to the Department through the Department of Energy Organization Act, 42 U.S.C. § 7151(b).  As an order issued under the Federal Power Act, Order No. 202-25-12 is subject to the rehearing and judicial review provisions of 16 U.S.C. § 825*l*. *See* 42 U.S.C. § 7192(a) ("Judicial review of agency action taken under any law the functions of which are vested by law in, or transferred or delegated to the Secretary [of Energy] . . . shall, notwithstanding such vesting, transfer, or delegation, be made in the manner specified in or for such law.").

On behalf of the People of the State of Michigan, on January 22, 2026, the Michigan Attorney General participated in the proceedings before the Department of Energy and timely filed a request for rehearing of Order No. 202-25-12 (Exhibit B). As explained in the Department's Notice of Denial of Rehearing By Operation of Law (Exhibit C), that rehearing request may be deemed denied by operation of law because the Department did not act upon it within 30 days. *See* 16 U.S.C. § 825*l*(a); *Allegheny Def. Project v. FERC*, 964 F.3d 1, 18-19 (D.C. Cir. 2020). Therefore, the Michigan Attorney General may file this petition for review under 16 U.S.C. § 825*l*(b). This petition is timely filed within sixty days of the denial of rehearing. 16 U.S.C. § 825*l*(b). The People of the State of Michigan are a party aggrieved by the Schahfer Order, this Court has jurisdiction, and venue in this Court is proper under 16 U.S.C. § 825*l*(b). Petitioner respectfully requests that this Court hold unlawful, vacate, and set aside the Order, and grant such further relief as may be deemed just and proper.

Dated: April 2, 2026

Respectfully submitted,

Dana Nessel,
Michigan Attorney General

*/s/ Michael Moody*
Michael E. Moody (P51985)
Lucas Wollenzien (P86928)
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
517-335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

Christopher M. Bzdok (P53094)
Special Assistant Attorney General
chris@tropospherelegal.com


CC:

DOE:
AskCR@hq.doe.gov
The.secretary@hq.doe.gov

Earthjustice:
mlenoff@earthjustice.org
jyun@earthjustice.org
sdoshi@earthjustice.org

Sierra Club:
greg.wannier@sierraclub.org
tony.mendoza@sierraclub.org
Jonah.baskin@sierraclub.org

ELPC:
bklein@elpc.org
nwallace@elpc.org

Midcontinent Independent:
jkrouse@misoenergy.org
mkessler@misoenergy.org
jholsclaw@calfee.com
tcarpenter@calfee.com

MISO States:
brad@misostates.org
tricia@misostates.org

Illinois Commerce Commission:
Robert.runk@illinois.gov
Christine.ericson@illinois.gov

# Exhibit A

## (the Schahfer Order)



**Department of Energy**
Washington, DC 20585

**Order No. 202-25-12**

Pursuant to the authority vested in the Secretary of Energy by section 202(c) of the Federal Power Act (FPA),[1] and section 301(b) of the Department of Energy Organization Act,[2] and for the reasons set forth below, I hereby determine that an emergency exists in portions of the Midwest region of the United States due to a shortage of electric energy, a shortage of facilities for the generation of electricity, and other causes. Issuance of this Order will meet the emergency and serve the public interest.

## *BACKGROUND*

The R.M. Schahfer Generating Station (Schahfer) is an electric generating facility in Wheatfield, Indiana. Schahfer is owned and operated by Northern Indiana Public Service Company (NIPSCO), a division of NiSource Inc. Schahfer consists of two 129 MW natural-gas fired units and two coal-fired units, Unit 17 (423.5 MW) and Unit 18 (423.5 MW).[3] Unit 17 and Unit 18 began operations in 1983 and 1986 respectively. Unit 17 and Unit 18 are both slated to cease operations in December 2025.[4]

## *EMERGENCY SITUATION*

Midcontinent Independent System Operator, Inc.'s (MISO) year-round resource adequacy concerns are well documented. In 2022, MISO requested Federal Energy Regulatory Commission (FERC) approval of its filing to revise its resource adequacy construct (including the Planning Resource Auction or PRA) to establish capacity requirements for each of the four seasons of the year rather than on an annual basis determined by peak summer demand.[5] MISO justified this revision by explaining that "Reliability risks associated with Resource Adequacy have shifted from 'Summer only' to a year-round concern."[6] MISO noted that over 60% of all

---

[1] 16 U.S.C. § 824a(c).

[2] 42 U.S.C. § 7151(b).

[3] U.S. Energy Information Administration, Form EIA-860, Schedule 3: Generator Data (2024), https://www.eia.gov/electricity/data/eia860/.

[4] As coal-fired facilities, it would be difficult for the Schahfer Units 17 and 18 to resume operations once they have been retired. Specifically, any stop and start of operation creates heating and cooling cycles that could cause an immediate failure that could take 30-60 days to repair if a unit comes offline. In addition, other practical issues, such as employment, contracts, and permits may greatly increase the timeline for resumption of operations. Further, if Schahfer were to begin disassembling the plant or other related facilities, the associated challenges would be greatly exacerbated. Thus, continuous operation is required in such cases so long as the Secretary determines a shortage exists and is likely to persist.

[5] *Midcontinent Independent System Operator, Inc.,* FERC Docket No. ER22-495-000 (Nov. 30, 2021). This request was approved by FERC on August 31, 2022. *See Midcontinent Independent System Operator, Inc.*, 180 FERC ¶ 61,141 (2022).

[6] MISO Transmittal Letter at 3, FERC Docket No. ER22-495-000 (Nov. 30, 2021).

"MaxGen" events (events when MISO initiates emergency procedures because of concerns over the adequacy of available generation) occurred outside of the summer season.[7]

In December of 2023, MISO released an "Attributes Roadmap," in which it presented "an in-depth look at the challenges of operating a reliable bulk electric system in a rapidly transforming energy landscape."[8]  Among other things, this report described changes in the time of year during which the risk of the loss of load was greatest.  For the 2023/24 Planning Year, the greatest risk of loss of load was in the summer, but it is expected that by the summer of 2027, there will be an equal loss of load risk in both the summer and fall seasons.  MISO also projected that the risk of loss of load in the winter and spring seasons, although not as high as in the summer or fall, will nevertheless increase over time.[9]

More recently, MISO affirmed the resource adequacy problems occurring outside of its summer season in its 2024 report entitled, "*MISO's Response to the Reliability Imperative.*"[10]  In a section of that report entitled "Risks in Non-Summer Seasons," MISO again stressed that it has resource reliability concerns outside of the summer season:

> Widespread retirements of dispatchable resources, lower reserve margins, more frequent and severe weather events and increased reliance on weather-dependent renewables and emergency-only resources have altered the region's historic risk profile, creating risks in non-summer months that rarely posed challenges in the past.[11]

These MISO studies indicate that the emergency conditions caused by the loss of generation capacity in MISO extend past the summer season.  The evidence indicates that there is also a potential longer term resource adequacy emergency in MISO.

In its 2024 Long-Term Reliability Assessment (LTRA), the North American Electric Reliability Corporation (NERC) notes that the MISO assessment area is at an elevated risk "because probabilistic assessments indicate above-normal generator outages during extreme weather can result in unserved energy or load loss.  With uncertainty around new resource additions and existing generator retirements, MISO is also at risk of falling below [Reference Margin Levels] within the next five years."[12]

When MISO reported the results of its PRA for the 2025-26 Planning Year, it noted that "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources" in the northern and central zones, which include Indiana.[13]

---

[7] *Id.* at 3-4.

[8] MISO, *Attributes Roadmap*, at 3 (Dec. 2023), https://cdn.misoenergy.org/2023%20Attributes%20Roadmap63117 4.pdf.

[9] *Id.* at 11.

[10] MISO, *MISO's Response to the Reliability Imperative* (Updated February 2024), https://cdn.misoenergy.org/2024+ Reliability+Imperative+report+Feb.+21+Final504018.pdf.

[11] *Id.* at 12.

[12] *NERC 2024 Long-Term Reliability Assessment*, at 13 (December 2024, corrected July 11, 2025), https://www.ner c.com/globalassets/our-work/assessments/2024-ltra_corrected_july_2025.pdf.

[13] MISO, *Planning Resource Auction: Results for Planning Year 2025-26*, at 13 (April 2025), https://cdn.misoenergy .org/2025%20PRA%20Results%20Posting%2020250529_Corrections694160.pdf.

On June 6, 2025, the Organization of MISO States (OMS) and MISO issued the results of their survey, which has been conducted annually for many years to determine the degree to which expected capacity resources satisfy planning reserve margin requirements.[14] The 2025 Survey presented projections of resource adequacy for the summer of 2026 and subsequent years. Although the survey projected a potential capacity surplus for the summer of 2026, it also projected that at least 3.1 GW of additional generation capacity beyond currently committed generation capacity must be added to meet the projected planning reserve margin.[15] The survey also projected that there would be insufficient capacity to meet the peak demand for electricity in each of the following four summers, increasing from a deficit of 1.4 GW in 2027 to 8.2 GW in 2030.[16] Similar results were projected for MISO's winter seasons, with a small surplus of generation capacity in 2026, followed by increasing deficits the following four years.[17]

The primary reasons for these projected deficits also are shown on the OMS-MISO survey. Large quantities of existing generation capacity are projected to be retired each year while, at the same time, the demand for electricity is projected to increase at an accelerating pace.[18] Although the OMS-MISO survey projects generation capacity to continue to increase in the coming years with the addition of new potential generation assets, the increase in capacity is largely offset by the projected retirements, and does not keep up with the growth in demand.[19]

MISO has been taking steps to address these projected deficits, but the solution is years away. For example, on June 6, 2025, MISO submitted a proposal to FERC to establish an Expedited Resource Addition Study (ERAS) process to provide a framework for the expedited study of interconnection requests to address urgent resource adequacy and reliability needs in the near term. This proposal was approved by FERC on July 21, 2025.[20] The ERAS process should help expedite the construction of needed new capacity. However, resources studied under the ERAS will have commercial operation dates that are at least three years away, and are provided an additional three-year grace period to commence commercial operations.[21] In addition, supply chain constraints impeding the acquisition of critical grid components, including large natural gas turbines and transformers, are likely to further hinder rapid construction and exacerbate reliability concerns.[22] Consequently, it is not at all clear that the new ERAS process will result in the addition of new capacity in the next few years.

More broadly, executive orders issued by President Donald J. Trump on January 20, 2025 and April 8, 2025, underscored the dire energy challenges facing the Nation due to growing

---

[14] OMS and MISO, *OMS-MISO Survey Results* (Updated June 6, 2025), https://cdn.misoenergy.org/20250606%20O MS%20MISO%20Survey%20Results%20Workshop%20Presentation702311.pdf.

[15] *Id.* at 2.

[16] *Id.* at 7.

[17] *Id.* at 9.

[18] *Id.* at 7, 9.

[19] *Id.*

[20] *Midcontinent Independent System Operator, Inc.*, 192 FERC ¶ 61,064 (2025).

[21] *Id.* P 84.

[22] *See generally*, S&P Global, *US Gas-Fired Turbine Wait Times as Much as Seven Years; Costs Up Sharply* (May 2025), ("With demand for natural gas-fired turbines in the US rapidly accelerating amid power demand growth forecasts driven by AI, manufacturing, and electrification, wait times for turbines are anywhere between one and seven years depending on the model, and costs have increased considerably, experts told Platts."), https://www.spglobal.com/commodity-insights/en/news-research/latest-news/electric-power/052025-us-gas-fired-turbine-wait-times-as-much-as-seven-years-costs-up-sharply.

resource adequacy concerns.  President Trump declared a national energy emergency in Executive Order 14156, "Declaring a National Energy Emergency," in which he determined that the "United States' insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy."[23]  The Executive Order adds: "Hostile state and non-state foreign actors have targeted our domestic energy infrastructure, weaponized our reliance on foreign energy, and abused their ability to cause dramatic swings within international commodity markets."[24]  In a subsequent Executive Order 14262, "Strengthening the Reliability and Security of the United States Electric Grid," President Trump emphasized that "the United States is experiencing an unprecedented surge in electricity demand driven by rapid technological advancements, including the expansion of artificial intelligence data centers and increase in domestic manufacturing."[25]

Further, the Department detailed the myriad challenges affecting the Nation's energy systems in its July 2025 "Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid," issued pursuant to the President's directive in Executive Order 14262.  The Department concluded that "[a]bsent decisive intervention, the Nation's power grid will be unable to meet projected demand for manufacturing, re-industrialization, and data centers driving artificial intelligence (AI) innovation."[26]

## *ORDER*

FPA section 202(c)(1) provides that whenever the Secretary of Energy determines "that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy," then the Secretary has the authority "to require by order . . .  such generation, delivery, interchange, or transmission of electric energy as in its judgment will best meet the emergency and serve the public interest."[27]  This statutory language constitutes a specific grant of authority to the Secretary to require the continued operation of Schahfer Units 17 and 18 when the Secretary has determined that such continued operation will best meet an emergency caused by a sudden increase in the demand for electric energy or a shortage of generation capacity.

Such is the case here.  As described above, the emergency conditions resulting from increasing demand and shortage from accelerated retirement of generation facilities will continue in the near term and are also likely to continue in subsequent years.  This could lead to the loss of power to homes and businesses in the areas that may be affected by curtailments or power outages, presenting a risk to public health and safety.  Given the responsibility of MISO to

---

[23] Executive Order No. 14156, 90 Fed. Reg. 8433 (Jan. 20, 2025) (*Declaring a National Energy Emergency*), https://www.federalregister.gov/documents/2025/01/29/2025-02003/declaring-a-national-energy-emergency.
[24] *Id*.
[25] Executive Order No. 14262, 90 Fed. Reg. 15521 (Apr. 8, 2025) (*Strengthening the Reliability and Security of the United States Electric Grid*), https://www.federalregister.gov/documents/2025/04/14/2025-06381/strengthening-the-reliability-and-security-of-the-united-states-electric-grid.
[26] U.S. Department of Energy, *Resource Adequacy Report: Evaluating the Reliability and Security of the United States Electric Grid*, at 1 (July 2025), https://www.energy.gov/sites/default/files/2025-07/DOE%20Final%20EO%20Report%20%28FINAL%20JULY%207%29.pdf.
[27] Although the text of FPA section 202(c) grants this authority to "the Commission," section 301(b) of the Department of Energy Organization Act transferred this authority to the Secretary of Energy.  *See* 42 U.S.C. § 7151(b).

identify and dispatch generation necessary to meet load requirements, I have determined that, under the conditions specified below, continued additional dispatch of Schahfer Units 17 and 18 is necessary to best meet the emergency arising from increased demand, determined shortage, and other causes, and serve the public interest under FPA section 202(c).

To ensure Schahfer Units 17 and 18 will be available if needed to address emergency conditions, Schahfer Units 17 and 18 shall remain in operation until March 23, 2026.

Based on my determination of an emergency set forth above, I hereby order:

A.  From December 23, 2025, MISO and NIPSCO, shall take all measures necessary to ensure that Schahfer Units 17 and 18 are available to operate.  For the duration of this Order, MISO is directed to take every step to employ economic dispatch of Schahfer Units 17 and 18 to minimize cost to ratepayers.  Following the conclusion of this Order, sufficient time for orderly ramp down is permitted, consistent with industry practices.  NIPSCO is directed to comply with all orders from MISO related to the availability and dispatch of the Schahfer Units 17 and 18.

B.  To minimize adverse environmental impacts, this Order limits operation of dispatched units to the times and within the parameters as determined by MISO, pursuant to paragraph A.  MISO shall provide a daily notification to the Department (via AskCR@hq.doe.gov) reporting whether Schahfer Units 17 and 18 has operated in compliance with the allowances contained in this Order.

C.  All operation of Schahfer Units 17 and 18 must comply with applicable environmental requirements, including but not limited to monitoring, reporting, and recordkeeping requirements, to the maximum extent feasible while operating consistent with the emergency conditions.  This Order does not provide relief from any obligation to pay fees or purchase offsets or allowances for emissions that occur during the emergency condition or to use other geographic or temporal flexibilities available to generators.

D.  By January 13, 2026, MISO is directed to provide the Department of Energy (via AskCR@hq.doe.gov) with information concerning the measures it has taken and is planning to take to ensure the operational availability of Schahfer Units 17 and 18 consistent with this Order.  MISO and NIPSCO shall also provide such additional information regarding the environmental impacts of this Order and its compliance with the conditions of this Order, in each case as requested by the Department of Energy from time to time.

E.  NIPSCO is directed to file with the Federal Energy Regulatory Commission Tariff revisions or waivers to effectuate this Order, as needed.  Rate recovery is available pursuant to 16 U.S.C. § 824a(c).

F.  This Order shall not preclude the need for Schahfer Units 17 and 18 to comply with applicable state, local, or Federal law or regulations following the expiration of this Order.

G.  Because this Order is predicated on the shortage of facilities for generation of electric energy and other causes, Schahfer Units 17 and 18 shall not be considered capacity resources.

H.  This Order shall be effective from 11:59 PM Eastern Standard Time (EST) on December 23, 2025, and shall expire at 11:59 PM Eastern Daylight Time (EDT) on March 23, 2026, with the exception of applicable compliance obligations in paragraph D.

Issued in Denver, Colorado at 6:39 PM EST on this 23rd day of December 2025.


*Chris Wright*

Chris Wright
Secretary of Energy


cc:     **<u>FERC Commissioners</u>**
        Chairman Laura V. Swett
        Commissioner David Rosner
        Commissioner Lindsay S. See
        Commissioner Judy W. Chang
        Commissioner David A. LaCerte

        **<u>Indiana Utility Regulatory Commission</u>**
        Chairman Jim Huston
        Commissioner David Veleta
        Commissioner David Ziegner

# Exhibit B

## (Request for Rehearing

## Order No. 202-25-12)

**UNITED STATES DEPARTMENT OF ENERGY**

| | |
|---|---|
| Midcontinent Independent System Operator | Order Nos. 202-25-12, 202-25-13 |

**MOTION TO INTERVENE AND PETITION FOR REHEARING**
**OF THE STATES OF MINNESOTA AND ILLINOIS AND THE PEOPLE OF THE STATE**
**OF MICHIGAN**

Pursuant to section 202 (c) of the Federal Power Act, 16 U.S.C. §§ 824a(c), 825l, the States of Minnesota and Illinois and the People of the State of Michigan ("the States"), move to intervene and petition for rehearing of the Department of Energy's ("DOE") orders 202-25-12 (Schahfer) and 202-25-13 (Culley Unit 2) (together, "Orders"),[1] directing the Midcontinent Independent System Operator ("MISO"), Northern Indiana Public Service Company ("NIPSCO") and CenterPoint Energy ("CenterPoint") to take all measures necessary to ensure that the coal-burning Schahfer plant ("Schahfer") and coal-burning Culley Unit 2 ("Culley") are "available to operate" and "to take every step to employ economic dispatch" of those resources. The Orders are in effect from 11:59 PM Eastern Standard Time (EST) on December 23, 2025, until 11:59 PM Eastern Daylight Time (EDT) on March 23, 2026,.

Pursuant to the Federal Power Act ("the Act") and Department procedures applying it to petitions for rehearing, the States hereby file this timely request for rehearing of DOE's Schahfer and Culley Orders. Some of the States have already sought both rehearing and review of three similar orders that the

---

[1] All Exhibits are lettered and attached; to be submitted in separate serial emails to the DOE's AskCR <askcr@hq.doe.gov> account.

DOE issued to the J.H. Campbell Plant in West Olive, Michigan. The Schahfer and Culley Orders perpetuate the same errors underlying the Campbell Order, perpetuating DOE's flawed analyses, faulty conclusion that an emergency exists for the MISO Regional Transmission Organization ("RTO"), and unlawful directives—all of which together harm the States.

The Schahfer and Culley Orders exceed DOE's legal authority in several respects. And even if an emergency did exist and DOE had the legal authority to issue such orders, the Schahfer and Culley Orders are not rationally related to meet the purported need. They should be rescinded.

.

TABLE OF CONTENTS

Motion to Intervene ........................................................................................... 4

Petition for Rehearing .......................................................................................11

    I.    Overview and Concise Statement of Error ....................................... 12

    II.    Legal Background ............................................................................ 14

    III.    Statement of Issues......................................................................... 15

    IV.    MISO's Robust Capacity and Planning Projections are Adequate to Ensure Reliability.. 18

    V.    Argument ......................................................................................... 22

        A.    The Orders are not supported by substantial evidence demonstrating the existence of an actual emergency and they do not demonstrate any reasoned decision-making................... 22

        B.    The Orders exceed DOE's authority because they are not limited to a specific inadequate power supply situation as required by Section 202(c) and 10 C.F.R. § 205.371.33

        C.    The Orders exceed DOE's authority because they requires actions not listed in Section 202(c)(1)............................................................................................... 39

        D.    The Orders exceed DOE's authority because they do not set hours of operation, limit hours of operation, or minimize environmental impact as required by Section 202(c)(3). .. 40

        E.    The Orders exceed DOE's authority because Section 201(b)(1) reserves decisions about plant retirements to the states. ...................................................................... 40

        F.    The Orders are unreasoned, arbitrary, and capricious because their directive for "economic dispatch" is inherently contradictory with the needs to meet an actual emergency. ........................................................................................................ 45

        G.    The purported emergency is pretext for a prejudged outcome. .................... 51

Conclusion .......................................................................................................... 54

**MOTION TO INTERVENE**

The States[2] move to intervene in this proceeding and thereby to become parties for purposes of Section 313l of the Act, 16 U.S.C. § 825l. The States have an interest in and are aggrieved by the subject orders (Exs. A, B) in several ways and seek to intervene and petition for rehearing. *FDR v. R.J. Reynolds Vapor Co.*, 606 U. S. ___ (2025) (slip op., at 3–8) (defining an "adversely affected or aggrieved" party within the APA as "anyone even 'arguably within the zone of interests to be protected or regulated by the statute . . . in question.'" (quoting *Association of Data Processing Service Organizations, Inc. v. Camp*, 397 U. S. 150, 153 (1970))).

*Factual Background*

The utilities regulated by the States are members of MISO, the electric grid operator for the central United States. MISO covers the largest geographical range of any independent system operator ("ISO") in the U.S. The 15 states covered by MISO are: Arkansas, Illinois, Indiana, Iowa, Kentucky, Louisiana, Michigan, Minnesota, Mississippi, Missouri, Montana, North Dakota, South Dakota, Texas, and Wisconsin. As the ISO of the electric grid in this region, MISO manages the flow of electricity across the high-voltage, long-distance power lines. To do so, MISO develops rules so that the wholesale electricity transmission system operates reliably and safely. MISO has described this as being like the "air traffic controller" for the grid in its territory,[3] meaning that MISO seeks to resolve power congestion (traffic) issues in real-time through its control room and has processes in place to anticipate and avoid emergencies that could lead to the loss of power.

---

[2] *See* Minn. Stat. § 8.01 ("The attorney general shall appear for the state in all causes in the supreme and federal courts wherein the state is directly interested; also in all civil causes of like nature in all other courts of the state whenever, in the attorney general's opinion, the interests of the state require it.).

[3] "Meet MISO," https://www.misoenergy.org/meet-miso/about-miso/industry-foundations/what-we-do/ (last visited June 23, 2025).

On December 23, 2025, the DOE issued the Schahfer Order (202-7-12) to MISO and NIPSCO. Ex. A. On December 23, 2025, the DOE issued the Culley Order (202-7-13) to MISO and CenterPoint. Ex. B. Both orders were issued pursuant to section 202(c) of the Federal Power Act. *See* 16 U.S.C. § 824(c)(1).

The Orders direct MISO, in coordination with NIPSCO (Schahfer) and CenterPoint (Culley), the respective operators of the plants, to ensure that the plants remain available for operation during the period of the order (December 23, 2025, through March 23, 2026). *Id.*

These eleventh-hour Orders disrupted a longstanding planning sequence handled by state authorities and submitted to MISO, which included plans to retire the Schahfer and Culley Unit 2 plants on December 31, 2025.[4] Ex. C (NIPSCO IRP). The integrated resource planning process already accounted for increased need and slated adequate generation to meet requirements. Ex. C at 6 ("Thus, the 2024 IRP was structured to ensure a robust assessment of the type of resources needed to respond to emerging market conditions and future portfolio retirements."). As recently as October 29, 2025, NIPSCO recommitted to Indiana regulators its plan to retire Schahfer Units 17 and 18 in accordance with its January 2023 submission to MISO, which MISO approved in February 2023. Ex. E.

All three units at these two plants were slated for retirement because they are old and in disrepair, and the units experienced deferred maintenance leading up to their planned retirement; they cannot be economically operated and require significant overhaul and upkeep costs to stay running. For example, CenterPoint explained that the Culley Unit 2 retirement was part of a plan

---

[4] *See* Consumers Energy, "2021 Clean Energy Plan," https://www.consumersenergy.com/-/media/CE/Documents/company/IRP-2021.pdf (last accessed June 23, 2025).

that would save ratepayers $80 million.  Ex. D. And upon announcing the retirement of the Schahfer

units, NIPSCO touted the cost-savings of transitioning away from coal as a fuel source. Ex. F.

*Adverse Effects*

The States will be adversely affected by the Orders directed to the Schahfer and Culley coal units in many of the same ways that they were harmed by the Campbell Orders that they have separately requested rehearing or otherwise challenged.

The Schahfer and Culley Orders prevent the planned retirement of the respective plants with consequent negative impacts on the States.

First, households and businesses in the States, and the States as consumers in their own right, will pay higher electricity bills as a result of the Orders' imposition of costs and cost-recovery to the States. By ordering the utilities to take all steps necessary to make the coal plants available and ordering MISO to take all steps necessary for the plants to provide economic dispatch, costs are already being incurred and more costs will continue to be generated.

Notably, the age of the units is concerning for costs, especially given the cost-savings assessments of the retirement plans. The Orders will likely require at least a portion of capital expenditures and major maintenance costs, which will drive up costs and impact ratepayer bills. This would be in addition to the cost of rehiring operators and obtaining more coal, among other expenses.

Although the precise amount is not yet known, the Orders provide that cost recovery is available through Federal Energy Regulatory Commission ("FERC") proceedings. Exs. A-B at ¶E. The operators have already initiated cost recovery complaints before FERC that, if approved, will impact ratepayers on the States.

Second, the States will suffer environmental harms as a result of the Order. The coal operations at Schahfer and Culley are a significant source of particulate matter, nitrogen oxides,

7

sulfur oxides, and carbon dioxide,[5] among other pollutants. By extending the operations of the plants beyond their planned retirement dates, the Orders increase the amount of pollution emitted in the region, causing harm to the public health and welfare.[6] The States of Minnesota, Illinois, Michigan, and Wisconsin share the upper Midwest region and Great Lakes environment with Indiana. Depending on weather, air emissions in Indiana impact conditions in the States. Further, the States have an interest in the Great Lakes ecosystem into which pollutants from coal-burning power plants such as mercury are deposited. Such pollution is harmful to state economies including fisheries and recreation, human health, and the environment in general. The Schahfer plant is immediately southeast of Chicago, Illinois, and near the shore of Lake Michigan. The Culley Plant is located on the shore of the Ohio River immediate upstream of Illinois's southern border. Thus, the States have an economic, public health, and ecological interest in protecting their environment and natural resources from unnecessary pollution emanating from the Schahfer and Culley plants. The States are harmed because the Orders result in the unnecessary consumption of coal fuel that generates such pollution.

Coal-fired power plants also contribute to regional, national, and global greenhouse gas emissions, which cause global climate change. Climate change directly harms the States by imposing significant additional costs for responsive actions, disaster recovery, and resiliency programs. Increased emissions threaten state climate goals and the States' ability to comply with federal and state air pollution requirements.

---

[5] See In the Matter of the Application of Consumers Energy Co. for Approval of Its Integrated Res. Plan Pursuant to Mcl 460.6t & for Other Relief., No. U-21090, 2022 WL 2915368, at *73 (June 23, 2022).

[6] *See* Cross-State Air Pollution Rule (CSAPR) and Clean Air Act § 110.

Minnesota, for example, is experiencing rapid changes including higher winter temperatures and larger, more frequent extreme precipitation events, extreme heat, and drought.[7] Each of Minnesota's top-ten combined warmest and wettest years on record have occurred since 1998, with 2024 standing as the warmest year on record and 2019 the wettest.[8] Minnesota is already suffering from a significant uptick in devastating, large-area extreme rain events, threatening the state with ever greater frequency and intensity.[9] These events damage streets, wastewater facilities, businesses, homes, farms, and natural resources, costing local governments, business owners, and residents millions of dollars in cleanup, repairs, and adaptation expenses.[10] Wildfires are also becoming larger and more frequent, including a rash of devastating fires in the spring of 2025 that consumed more than 32,000 acres and destroyed an estimated 150 structures. The spring of 2024 included heavy precipitation and extreme rainfall events, leading to extensive flooding and federal disaster declarations for large parts of the state.[11] From 1980 to 2024, the annual average for billion-dollar weather and climate disasters in Minnesota is 1.4 events per year, but the annual average from 2020 to 2024 is 4.6 events.[12] The "Lost Winter" of 2023-2024 was the

---

[7] Minnesota Climate Trends, *Minnesota Department of Natural Resources* (2023), https://www.dnr.state.mn.us/climate/climate_change_info/climate-trends.html.

[8] *Id.*

[9] *Id.*

[10] *Id.*

[11] "Extreme Rainfall Drenches Northeastern Minnesota," Minnesota Department of Natural Resources, https://www.dnr.state.mn.us/climate/journal/extreme-rainfall-northeast-mn-june-18-2024; "Extreme Rain and Flooding in Southern Minnesota, June 20-22," Minnesota Department of Natural Resources, (August 9, 2024), https://www.dnr.state.mn.us/climate/journal/extreme-rain-flooding-southern-minnesota-june-20-22.html; "Disaster information," Minnesota Department of Public Safety, https://dps.mn.gov/divisions/hsem/em-resources/disaster-information (last visited June 23, 2025).

[12] "Billion Dollar Weather and Climate Disasters, Minnesota Summary, *NOAA National Centers for Environmental Information*, Billion-Dollar Weather and Climate Disasters | Minnesota Summary | National Centers for Environmental Information (NCEI)," https://www.ncei.noaa.gov/access/billions/state-summary/MN.

warmest on record, with temperatures averaging 10.9°F above 1991-2020 averages, greatly harming Minnesota's recreational economy.[13] These impacts will continue, and emissions from the Schahfer and Culley coal operations will contribute to them.

Climate change is affecting Illinois in a number of ways. Illinois' farming industry is vulnerable to cycles of extreme drought and extreme precipitation caused by climate change. In 2023, a severe drought dried up soil throughout the state, with extreme dryness extending down to 20 inches below the surface in some areas.[14] In other years, extreme precipitation has threatened Illinois' agriculture. For instance, January to June of 2013 was the wettest period ever recorded in Illinois, causing widespread flooding in farmland that forced farmers to delay planting and lose revenue.[15] Climate change is also intensifying catastrophic extreme weather events. In 2024, the Illinois State Climatologist recorded strong wind, hail, and tornadoes across all of Illinois' 102 counties and the state logged 142 tornadoes—a new annual record.[16] These storms included a July 15, 2024 "derecho" that produced 100 mile-per-hour winds and 48 separate tornadoes.[17] In the

---

[13] *Id*.

[14] Illinois State Climatologist, Drought Worsens in a Very Dry June (June 30, 2023), https://stateclimatologist.web.illinois.edu/2023/06/30/drought-worsens-in-a-very-dry-june/ (last visited May 23, 2025).

[15] University of Illinois–Institute of Government & Public Affairs, Preparing for Climate Change in Illinois: An Overview of Anticipated Impacts (2015), https://indigo.uic.edu/articles/report/Preparing_for_Climate_Change_in_Illinois_An_Overview_ of_Anticipated_Impacts/15078939/1 (last visited May 23, 2025). See also U.S. Dept. of Agriculture Climate Hubs and Great Lakes Research Integrated Science Assessment, Climate Change Impacts on Illinois Agriculture (2022), https://www.climatehubs.usda.gov/sites/default/files/2022_ClimateChangeImpactsOnIllinoisAgri culture.pdf (last visited May 23, 2025).

[16] Tony Briscoe, Lake Michigan Water Levels Rising at Near Record Rate, CHICAGO TRIBUNE (July 12, 2015), https://www.chicagotribune.com/2015/07/12/lake-michigan-water-levels-rising-at-near-record-rate/ (last visited May 23, 2025).

[17] National Weather Service, July 15, 2024 Derecho Produces Widespread Wind Damage and Numerous Tornadoes, available at https://www.weather.gov/lot/2024_07_15_Derecho#:~:text=With%2032%20tornadoes%2C%20t

Chicago area alone, the derecho produced 32 tornados, breaking the previous records set by the July 2014 "double derecho" and a March 2023 storm.

As demonstrated by the attached declarations of Douglas Jester, Exhibits DD and EE, the Schahfer and Culley coal burning units—if continued to operate—would have significant monetary and environmental impacts on the States. The operation of Schahfer will result in approximately 1.0-1.9 deaths and $15.8 million to $29 million monetized health effects across Illinois, Michigan, and Minnesota. Ex. DD at ¶22 (*citing* EPA's the Co-Benefits Risk Assessment Health Impacts Screening and Mapping Tool (COBRA)). And the operation of Culley will result in approximately 0.16-0.325 deaths and $2.12 million to $4.23 million monetized health effects across Illinois, Michigan, and Minnesota. Ex. EE (same). The continued operation of the Schahfer and Culley coal units will have a net harmful effect on public health in Illinois, Michigan, and Minnesota. Ex. DD at ¶ 26; Ex. EE at ¶ 26.

Moreover, the States have an interest given their primary responsibility for resource planning and ensuring that there will be adequate and reliable electricity generation. The processes that States employ to ensure reliability—which takes into account planned retirements, new generation projects, transmission infrastructure, and meet consumer demand—are both sophisticated and robust. The Orders harm the States by usurping the traditional role that states play in generation planning and resource adequacy.

**PETITION FOR REHEARING**

---

he%20July,March%2031%2C%202023%20tornado%20outbreaks. (last visited May 25, 2025). See also David Struett, Tornado Record Broken with 27 Chicago Area Twisters July 15— Spawned by 'Ring of Fire', WBEZ CHICAGO, available at https://www.wbez.org/weather/2024/07/24/chicago-weather-tornado-record-derecho-july-15 (last accessed May 23, 2025)

### I.    Overview and Concise Statement of Error

The challenged Orders compound the error of the DOE's Campbell Orders in that they declare an emergency based on a shortage of electric energy generation when there is no emergency. Even if there were an emergency, the Orders impose several requirements that are inconsistent with and exceed DOE's legal authority. And even if DOE had the authority to impose the requirements, they are not directed to actions that will actually meet the purported emergency.

The Orders are premised on an incomplete recitation of MISO's planned capacity and reserves for the summer of 2025 through 2032.

The Orders misconstrue the source material on which they rely and still conclude only that there is a possibility of shortfalls. But they do not cite or rely on any evidence that there is any likelihood or probability that any shortfall will occur during the relevant timeframe of the Orders (December 23, 2025, through March 23, 2026).

The Orders conclude that the evidence collected (and discussed below) supports their issuance. They contend that the purported emergency will continue in the near term and is likely to continue in subsequent years. It declares—without any evidence identifying an emergency in December-March timeframe—that the alleged emergency "could lead to the potential loss of power to homes and local businesses in the areas that may be affected by curtailments or outages, presenting a risk to public health and safety." Exs. A at 4, B at 5 (emphasis added). They then order that MISO and the relevant utility shall take "all measures necessary to ensure that" the plants are "available to operate." *Id*. at ¶A. And MISO must "take every step to employ economic dispatch" of the plants "to minimize cost to ratepayers." *Id*. Further, they order that the plants operate according to times as determined by MISO. Importantly, the orders prohibit the plants from being considered a capacity resource. *Id*. at ¶ G.

12

These Orders were issued in error. The DOE did not have substantial evidence or engage in reasoned decision-making in declaring the existence of an emergency in general, be it far into the future or even in the December 2025-March 2026 timeframe.

The Orders start from the proposition that there is only a "potential" for insufficient capacity that "could" result in a need for mitigation, which does not present an actual existing or imminent emergency. *Id*. at 2. And in the same discussion, the Orders acknowledge that there is actually a projected surplus in the summer of 2026. *Id*. at 3 (citing MISO Survey, attached as Ex. G). But Section 202(c)'s plain terms limit DOE to actual emergencies—not the potential that emergencies might arise. Section 202(c) is also limited in the type of conduct it allows DOE to order, such as directing the generation, delivery, or transmission of electric energy. These Orders, however, require the plants to be "available to operate." Nothing in section 202(c) grants DOE authority to order a plant be available to operate without any demonstrated need during the timeframe of the order identified by the states with primary resource planning authority, the utility operating the resource, or grid operator responsible for forecasting and coordinating adequate and reliable supply.

Even if an emergency did exist during the timeframe of the orders and DOE had the legal authority to issue them, directing the plants to participate in the bidding market using economic dispatch would not rationally "best" meet the purported need because there is no evidence the coal plants can reasonably address any given future emergency need; this is because emergency responses do not require economic evaluation, and because the coal plants take so long to ramp up. The Orders should be rescinded.

13

## II.    Legal Background

Under section 202(c) of the Federal Power Act, the Commission[18] has authority to issue an order:

> [d]uring the continuance of any war in which the United States is engaged, or whenever the Commission determines that an emergency exists by reason of a sudden increase in the demand for electric energy, or a shortage of electric energy or of facilities for the generation or transmission of electric energy, or of fuel or water for generating facilities, or other causes. . . .

16 U.S.C. § 824(c)(1). The same subsection states that the Commission may order "temporary connections of facilities" and "generation, delivery, interchange, or transmission of electric energy" that, in the Commission's "judgment will best meet the emergency and serve the public interest." *Id*. The next subsection, 16 U.S.C. § 824(c)(2), establishes that an emergency order must be limited to only those hours necessary to meet the emergency. It states:

> With respect to an order issued under this subsection that may result in a conflict with a requirement of any Federal, State, or local environmental law or regulation, the Commission shall ensure that such order requires generation, delivery, interchange, or

---

[18] The "Commission" refers to the Federal Power Commission (FPC), whose powers were transferred in 1977 to either the Secretary of DOE or the Federal Energy Regulatory Commission (FERC). 16 U.S.C. § 796(14); Department of Energy Organization Act, Pub. L. No. 95-91, 91 Stat. 565, 565-613 (1977). This transfer gave FERC the authority over "the interconnection, under section 202(b), of such Act [16 U.S.C. 824a(b)], of facilities for the generation, transmission, and sale of electric energy (*other than emergency interconnection*)." 42 U.S.C. § 7172(a)(1)(B) (emphasis added). However, this transfer also gave DOE "the function of the Federal Power Commission, or of the members, officers, or components thereof" except as provided in subchapter IV of the act. 42 U.S.C. § 7151(b). Because 42 U.S.C. § 7172(a)(1)(B) explicitly excludes emergency interconnection from FERC's authority, the authority over emergency interconnection has historically been delegated to DOE. However, the delegation of this emergency authority to DOE has not been consistently applied. In *Richmond Power & Light v. FERC*, 574 F.2d 610 (1978), a petitioner objected to FERC's (not DOE's) failure to invoke emergency powers under 16 U.S.C. § 824a(c) and order utilities with excess capacity to supply the petitioner with energy. The court did not address whether FERC had the authority to declare an emergency to begin with. *Id*. Thus, whether FERC or DOE has the power to declare an emergency is inconclusive.

> transmission of electric energy only during hours necessary to meet the emergency and serve the public interest, and, to the maximum extent practicable, is consistent with any applicable Federal, State, or local environmental law or regulation and minimizes any adverse environmental impacts.

*Id*. at § 824(c)(2).

The applicable regulations define "emergency," as:

> an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities for the generation, transmission or distribution of electric power. Such events may be the result of weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected "entity" to prevent. An emergency also can result from a sudden increase in customer demand, an inability to obtain adequate amounts of the necessary fuels to generate electricity, or a regulatory action which prohibits the use of certain electric power supply facilities. Actions under this authority are envisioned *as meeting a specific inadequate power supply situation*.

10 C.F.R. § 205.371[19] (emphasis added).

### III.    Statement of Issues

**Issue A: Did DOE have substantial evidence for the Orders' declaration of an emergency, and did it exercise reasoned decision-making in declaring that an actual emergency exists?**

No. DOE relied on evidence that did not identify any likelihood or probability that there would be a shortfall during the relevant timeframe of the Orders' requirements—December 23, 2025, to March 23, 2025. Further, DOE failed to consider substantial countervailing evidence, including the MISO States' Integrated Resource Plans and MISO's assessment of surplus capacity for the summer of 2026. The Orders fail to identify any reasoned basis for concluding an actual emergency exists or is imminent, much less one that will occur between December 23,

---

[19] DOE issued 10 C.F.R. §§ 205.370-379 pursuant to the Department of Energy Organization Act's transfer of emergency responsibilities to the Secretary of Energy.

2025, and March 23, 2026. Instead, the Orders explicitly contemplate longer-term resource planning for the summer of 2027 and even into the 2030 timeframe—more than a year after the term of the Orders expires. Exs. A-B at 2-3.

**Issue B: Section 202(c)(1) allows DOE to issue temporary emergency orders in times of actual or impending emergencies such as war, sudden demand for electric energy, shortage of fuel or water, or other similar conditions creating a specific inadequate power supply situation. Did DOE exceed this authority where the Orders are based on the nonspecific possibility that such a situation might occur over a period of several months—or in the 2027-2030 timeframe, well outside of the Orders' applicability?**

Yes. An actual "emergency" is a sudden occurrence requiring immediate response action or a concrete need for energy to be produced; conversely, it is not the mere potential that an emergency might occur. 16 U.S.C. § 824a(c); 10 C.F.R. § 205.371. Emergency orders must respond to "a specific inadequate power supply situation." 10 C.F.R. § 205.371. The Orders do not address any sudden occurrence needing imminent response, nor do they identify any actual and specific insufficient supply situation. Instead, the Orders focus on vague non-summer needs and the potential for shortfalls several years away. The Orders are not directed to any emergency at all, much less one occurring in the December 23, 2025-March 23, 2026 timeframe. They are contrary to law.

**Issue C. Section 202(c)(1) allows DOE to issue emergency orders requiring the "generation, delivery, interchange, or transmission of electric energy." Did DOE exceed this authority where the Orders require the coal plants to take steps to be "available" to generate electricity and require MISO to employ economic dispatch?**

Yes. DOE's emergency powers allow it to order the generation, delivery, interchange, or transmission of electric energy. Section 202(c)(1) does not give the DOE the authority to order that a plant be available (absent a showing of why that is needed), nor does it give the DOE authority to order MISO to engage in potential economic dispatch. 42 U.S.C. § 16432(b). Because the Orders do not adhere to the types of actions allowed under section 202(c)(1), they are without authority and contrary to law.

16

**Issue D. If DOE issues an order pursuant to 202(c)(1), then 202(c)(2) requires it to set limits on hours of operation and ensure that environmental impact is minimized. Did DOE exceed its authority by invoking section 202(c) to issue Orders that set no specific hours of operation, places no limits on hours of operation, and adopts no specific requirements to minimize environmental impact?**

Yes. The statutory language requires an emergency order be limited to only those hours necessary to meet the emergency and minimize adverse environmental impacts. 16 U.S.C. § 824a(c)(2). The Orders do not establish any limited hours for operation, instead deferring to MISO. The Orders also do not meaningfully take steps to minimize adverse environmental impacts. Because the Orders do not set any specific hours the plants must run, and do not meaningfully minimize adverse environmental impacts, the Orders violate the requirements of section 202(c)(2). They are without authority and contrary to law.

**Issue E: The Federal Power Act reserves resource adequacy planning to the individual states. Did DOE exceed its authority where its Orders directly compel plants slated for retirement to take steps to be available to operate?**

Yes. Section 201(a) of the Federal Power Act explicitly provides that federal regulation over generation and transmission is related to matters of interstate commerce and extends "only to those matters which are not subject to regulation by the States." 16 U. S. C. § 824(a). States retain jurisdiction "over facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). DOE's Orders exceed its authority by contradicting existing resource plans. It also exceeds DOE's authority by purporting to engage in long-term resource planning for the years 2027-2030, which is a role reserved to the states. For both of these reasons, the Orders are contrary to law.

**Issue F: Even if DOE were correct that an emergency exists and that it had the authority to issue the Orders, will the Orders' requirements rationally meet the emergency?**

No. Section 202(c) contemplates emergency orders that are precisely tailored to "best" meet the specific emergency. 16 U.S.C. § 824a(c). The Orders' specific requirement for MISO to take steps to effectuate "economic dispatch" of the respective plants is not rationally related to the

emergency the Orders purport to address. The Orders do not explain how keeping the coal plants available to run will meet any particular need when MISO has adequate resources at its disposal without the output of the subject plants. The Orders, therefore, are without substantial evidence and lack reasoned decision-making.

**Issue G: Federal law prohibits agencies from prejudging the outcome of an action. Did the Secretary of Energy and the federal administration improperly prejudge the need for the Orders to the Schahfer and Culley coal units?**

Yes. As evidenced by public statements, the purported emergency is pretext for an improperly-prejudged outcome to preserve coal as a fuel for electrical generation.

### IV.    MISO's Robust Capacity and Planning Projections, in Tandem with State-Level Regulatory Processes, are Adequate to Ensure Reliability.

MISO is a regional transmission organization (RTO), an independent, non-profit, membership-based organization responsible for optimizing generation and transmission of electricity and ensuring the reliability of the electric power system within its region, consisting of nearly 3,000 generating units.[20] 18 C.F.R. § 35.34(a), (j)(1). MISO administers bulk or wholesale power markets that centrally commit and dispatch power to facilitate least-cost and reliable power production and delivery throughout the region. The wholesale markets within MISO signal and value power needs and identify the most economically efficient way—the least-cost approach where demand for energy equals the cost supplied—to meet them across the system.[21] MISO also

---

[20] MISO, *Fact Sheet* (July 2024), available at https://www.misoenergy.org/meetmiso/media-center/2024/corporate-fact-sheet.
[21] MISO, *Electric Grid 101*, available at https://www.misoenergy.org/meet-miso/grid-operations-basics

works to coordinate generation and transmission of electricity with other RTOs, exporting power at times and at others allowing electricity to be imported to MISO.[22] MISO uses advanced modeling and thorough research to coordinate short and long-term planning for the benefit of generating units and consumers.[23]

MISO planned for adequate capacity in 2025 and 2026—the timeframe of the Orders: MISO's Planning Resource Auction ["PRA"] for the 2025-2026 Planning Year "demonstrated sufficient capacity for all zones within the MISO Region." Ex. H at 2. It reports: "it is important to recognize existing processes have *cleared sufficient electric generating capacity across MISO for the periods of time covered by the Order*." *Id*. (emphasis added). And it goes on to describe its confidence that it has already ensured "sufficient capacity to meet anticipated demand across the MISO Region for the 2025-2026 Planning Year." *Id*.

The long-planned retirement of the plants subject to the Orders is not an impediment to reliability in the MISO region. Since 2010, MISO has experienced the retirement of 30.8 gigawatts (GW) of generation capacity, a large proportion of which (21.9 GW) was coal-fired generating

---

[22] MISO, *Interregional Coordination*, available at https://www.misoenergy.org/planning/interregional-coodination/; see also MISO, Historical Net Scheduled Interchange (NSI), at https://www.misoenergy.org/markets-and-operations/real-time--marketdata/ market-reports/ (data found under "Summary" Market Reports).
[23] MISO, *Transmission and Generation Planning 101*, available at https://www.misoenergy.org/meet-miso/grid_planning_basics.

units.[24] That trend is shown below in the bar graph (from MISO's 2023 Transmission Expansion Plan Report,[25] Ex. I at 35), which displays the retired capacity by generation type over time:



Figure 2.2-1: MW Generation Retirement by Fuel Type

Through use of generation capacity and transmission infrastructure planning, the addition of new capacity—in particular renewables, and the implementation of the other measures discussed above, MISO has been able to absorb these retirements and maintain overall system reliability. *Id*. at 34-35. The sufficiency of MISO's planning was recently affirmed in MISO's Answer to NIPSCO's Complaint in FERC Docket EL26-38-000, with the grid operator stating that:

---

[24] *See also* MISO, *Approved Generator Retirements (Public) as of June 28, 2024* ("*Approved Retirements 2024*"),
https://www.oasis.oati.com/woa/docs/MISO/MISOdocs/OASIS_Posting_of_Approved_Generato r_Retirements_(Public)_2024-06-28.pdf).
[25] MISO, *2023 Transmission Expansion Plan*, available at
https://cdn.misoenergy.org/MTEP23%20Executive%20Summary630586.pdf.

> [I]t is important to recognize existing processes have cleared sufficient electric generating capacity across MISO for the periods of time covered by the Order. The clearing of sufficient capacity to meet anticipated demand across the MISO Region for the 2025- 2026 Planning Year reflects the diligent efforts of MISO's members, Market Participants, Relevant Electric Retail Regulatory Authorities ("RERRA") and the Federal Energy Regulatory Commission ("FERC") to establish policies and processes that address both immediate and future capacity requirements. MISO continues to work with these parties in the context of anticipated growing demand for electricity, planned electric generating facility retirements, and an evolving mix of new electric generating resources to refine processes that address the challenges ahead. MISO is confident that these collaborative efforts do not require further intervention and will help ensure the region continues to procure sufficient capacity to meet demand.[26]

The sufficiency of resource planning here has further been subject to review through Indiana's Integrated Resource Plan (IRP) processes; both NIPSCO and Centerpoint have acknowledged that the planned retirements of the coal units at issue were subject to IRP review before the Indiana Utility Regulatory Commission.[27] Indiana's statute governing the contents of IRP submissions requires that utilities include a breadth of analysis and forecasting as to resource planning.[28] Utilities in Indiana's MISO transmission area are further required to submit to the IURC their annual resource adequacy assessment as reported to MISO.[29] Thus, through these

---

[26] Answer of the Midcontinent Independent System Operator, Inc., FERC Docket EL26-36-000 at 2 (January 20, 2026).

[27] *See, e.g.*, Complaint and Request for Fast Track Processing of Northern Indiana Public Service Company LLC, FERC Docket EL26-36-000 at 7 (December 29, 2025) ("NIPSCO's 2021 Integrated Resource Plan ("IRP") included a retirement analysis to assess retirement dates for different generating units of its existing generation fleet"); *See also, e.g.*, Complaint Requesting Fast Track Processing, FERC Docket EL26-38-000 at 9 – 10 (January 5, 2026).

[28] *See*, 170 Ind. Admin. Code 4-7-4 (The required "[i]ntegrated resource plan contents" including, to provide just a few examples of many, "[a]t least a twenty (20) year future period for predicted or forecasted analyses," "[a]n analysis of historical and forecasted levels of peak demand and energy usage in compliance with section 5(a) of this rule," and "[a] description of the candidate resource portfolios and the process for developing candidate resource portfolios in compliance with section 8(a) and 8(b) of this rule.").

[29] *See*, 170 Ind. Admin. Code 4-7-2.3(a).

21

processes, extensive planning for the retirement of the Schahfer and Culley units at issue has been conducted,[30] in conjunction with the grid-operator's resource adequacy planning.


## V.    Argument

### A.    The Orders are not supported by substantial evidence demonstrating the existence of an actual emergency and they do not demonstrate any reasoned decision-making.

The DOE failed to provide substantial evidence that an unexpected emergency presently exists, as required by 16 U.S.C. § 824a(c)(5). The relevant standard is whether the DOE's determination is supported by substantial evidence. 16 U.S.C. § 824a(c)(5) refers to the possibility of judicial review under 16 U.S.C. § 825l. After an objection has been brought before DOE, the Court may consider it with the understanding that "[t]he finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive." 16 U.S.C. § 825l. Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Duke Energy Corp. v. FERC*, 892 F.3d 416, 420 (2018). This standard implies deference to an agency's factual determinations. See, e.g., id.

DOE failed to point to substantial evidence of a current and unexpected emergency in the December 23, 2025, to March 23, 2026, timeframe during which the Orders are in effect. The evidence DOE provided does, however, prove that there is currently no energy emergency and that there will not be an "unexpected emergency" that warrants these Orders. MISO is well situated to

---

[30] *See, e.g.*, Integrated Resource Plan, NIPSCO 2024 Summary (Including at page 9, for example, that "NIPSCO will continue to complete and place in service wind, solar, and solar plus storage replacement resources previously approved by the Commission for the scheduled 2025 retirement of all coal units at Schahfer….") (accessible at https://www.nipsco.com/docs/librariesprovider11/rates-and-tariffs/irp/nipsco_2024-irp.pdf).

22

deliver reliable power throughout its area in the winter, spring, and summer of 2026. Longer-term resource needs are the subject of resource planning, not emergency action.

In declaring the contrary, DOE relied on a 2024 <u>long-term</u> reliability assessment by NERC, (Exs. A-B at 2), but that assessment identified an *"elevated"* risk for <u>potential</u> capacity exceedance <u>if</u> an extreme weather event were to occur. Ex. J at 6 (defining "elevated risk"). Indeed, the assessment explicitly shows that there will be more than enough anticipated reserve margin every summer through 2031, and every winter through 2032:



**Figure 3: MISO Planning Reserve Margin–Summer**

**Figure 4: MISO Planning Reserve Margin–Winter**

*Id*. at 13. Thus, the Orders make too much out of too little—the "elevated" category is hardly a call for immediate and unnecessary emergency action when there will be adequate reserve margins for years to come. As the long-term NERC assessment points out, MISO expects to have adequate capacity even factoring in the longstanding plant retirement plans that it approved. Indeed, the

LTRA Executive Summary makes a host of recommendations to ensure system reliability, not one of which is for DOE to issue emergency orders requiring old, unreliable, and expensive coal plants to continue running. Ex. J at 10. While retirements and fewer suppliers meant that MISO would have fewer firm resources and dispatchable generation, that was no cause for alarm. And nothing in the NERC assessment determined that MISO's interconnection with other RTOs would be insufficient to cover any needs that could arise.

The "elevated risk" category is not tantamount to an emergency. Even though NERC used the term "elevated risk" for the possibility that there could be an operating reserve shortfall, NERC did not apply the "high risk" category to MISO, and did not call for any retired plants to be brought back online. Moreover, the "elevated risk" designation means that MISO is projected to meet resource adequacy criteria and have energy and capacity for normal forecasted conditions and is only "at risk of supply shortfall in extreme conditions." *Id*. at 12. NERC concluded that its probabilistic assessments for MISO "indicate above-normal generator outages during extreme weather can result in unserved energy or load loss…. [w]ith uncertainty around new resource additions and existing generator retirements, MISO is also at risk of falling below RMLs within the next five years." Thus, there is no emergency. An extreme weather event could cause unserved energy or load loss. But the Orders do not identify any extreme weather event occurring during their timeframe. And even then, the NERC long-term assessment does not say that there would be inadequate methods to address such outages, such as system interconnections.

Perhaps most simply, the "elevated risk" designation is far from unusual; it has never required an emergency order before, and the grid has remained stable. MISO has been designated an "elevated" risk in every NERC Summer Reliability Assessment since NERC initiated the

practice of designating regions as "high," elevated," or "normal" risk in 2021.[31] NERC has also designated MISO as "elevated" risk in the 2021-2024 Winter Reliability Assessments since 2021. *Id*. Yet no energy shortage has occurred and DOE has never imposed an emergency declaration until now (see *infra* regarding prejudgment and pretext). And more pertinent here, the latest NERC 2025-2026 Winter Reliability Assessment actually shows MISO as "normal risk" for the winter months—the lowest category of risk designation—as opposed to "elevated risk."[32]

In fact, the evidence before DOE cuts against the Orders. This includes MISO's PRA for 2025-2026, which found sufficient capacity throughout the region. Exs. K-L. The press release announcing the PRA, (*id*.), confirms "adequate resources are available to maintain reliability during the upcoming planning year (June 2025 – May 2026)." Ex. L. And while "the 2025 auction prices reflect a tightening supply-demand balance during the summer months, there is sufficient capacity throughout the MISO footprint." *Id*. The PRA was based on NERC's standard BAL-502-RF-03 (Ex. M), requiring assessment of "one day in ten year" loss of load expectation principles. In short, the NERC standard that MISO applied to conduct the PRA demonstrated that MISO will have sufficient capacity through the summer of 2025. *Id*. MISO's PRA results show that there will be enough capacity in the summer planning year, and MISO notes that the summer auction price provides a signal to the market to add more capacity for future auction years. DOE appears to have cherry-picked certain phrases from the PRA but does not give it full consideration.

---

[31] *See* NERC*, Reliability Assessments,* https://www.nerc.com/pa/RAPA/ra/Pages/default.aspx (last visited January 20, 2025).

[32] North American Electric Reliability Corporation, 2025-2026 Winter Reliability Assessment (November 2025), https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf, at 6 fig. 1.

And beyond the lack of supporting evidence, DOE also acted arbitrarily and capriciously by ignoring well-known and readily-accessible contrary information. For example, DOE failed to consider recent comments by MISO's Independent Market Monitor to the Markets Committee of the MISO Board of Directors dispelling NERC's purported concerns. Ex. N. The Independent Market Monitor is charged with ensuring adequate supply markets for the MISO region. He criticized a separate NERC long-term reliability assessment (which has since been revised[33]) that included capacity shortfalls in 2025, noting that NERC's assessment compared the wrong numbers. In doing so, the Independent Market Monitor declared MISO capacity to be "more than adequate," and that he had "no material concerns" over MISO's resource adequacy for the upcoming summer. *Id*. Resource sufficiency for the period of the DOE Orders is reinforced by the recent finding of merely "normal risk" in MISO per NERC's 2025-2026 Winter Reliability Assessment.[34] That assessment likewise finds that MISO's anticipated and projected resources exceed the reference margin level.[35]

DOE also failed to consider MISO's history of strong performance through several extreme weather events including Winter Storms Elliot and Uri, and did not credit MISO's proven track record of engaging in a variety of mechanisms to ensure grid reliability.

---

[33] NERC, *Statement of NERC's Long-term Reliability Assessment*, (June 17, 2025) https://www.nerc.com/news/Pages/Statement-on-NERC%E2%80%99s-2024-Long-Term-Reliability-Assessment.aspx?utm_source=substack&utm_medium=email.

[34] North American Electric Reliability Corporation, 2025-2026 Winter Reliability Assessment (November 2025), https://www.nerc.com/globalassets/our-work/assessments/nerc_wra_2025.pdf, at 6 fig. 1.

[35] *See, id*. at 42 fig. 4. The reference margin level varies by region; it is used by system planners to quantify the amount of reserve capacity in the system above the forecasted peak demand that is needed to ensure sufficient supply to meet peak loads." *Id*. at 41. MISO's reference margin level is substantially higher than that of any other region in North America. *See, id*. at 42.

27

DOE further failed to acknowledge that no part of MISO is currently afflicted by any unexpected outage or extreme weather event, and the entire system is running as planned with no outages, unexpected demand, lack of fuel or water, or other such emergencies in place at the time of the Orders.

The evidence cited in the Orders does not support the conclusions that DOE draws. For example, the NERC Long Term Reliability Assessment does not identify any war, fuel shortage, or natural disaster. Ex. J. Rather, it evaluates generation resource and transmission system adequacy as well as energy sufficiency to meet projected summer peak demands and operating reserves. Id. at 42-44.

A later assessment for the summer of 2025 concluded that all areas were projected to have "adequate anticipated resources for normal summer peak load conditions." Ex. O. Indeed, the "elevated risk" designation means the probabilistic indices are low but not negligible. *Id*. at 10, Table 1. And further, the MISO-specific "dashboard" concludes that MISO's expected resources meet operating reserve requirements under normal peak-demand scenarios. At worst, operating mitigations "could" be necessary for above-normal summer peak load and extreme generator outage conditions:

> **Risk Scenario Summary**
> Expected resources meet operating reserve requirements under normal peak-demand scenarios. Above-normal summer peak load and extreme generator outage conditions could result in the need to employ operating mitigations (e.g., load-modifying resources and energy transfers from neighboring systems) and EEAs. Emergency declarations that can only be called upon when available generation is at maximum capability are necessary to access load-modifying resources (demand response) when operating reserve shortfalls are projected.

*Id*. at 16.

Second, the Orders describe a sequence of resource retirements without acknowledging the replacement capacity that came online (or that is/was planned to come online) to offset those

retirements. Exs.A-B. In any event, NERC's long-term analysis already factored in an assumption that included those retirements. Ex J.

Third, the Orders cite NERC's "elevated risk" determination. But the retirements of Schahfer and Culley coal operations were already known to, and approved by, MISO operators who accounted for the retirement in their robust resource planning processes (described in further detail herein). Exs. P-Q.

Indeed, the Orders acknowledge that the retirement was already factored into MISO's own supply forecasts. Exs. A-B at 2. MISO's PRA (Exs. H, L) confirm adequate margin. *Id*. In fact, for the fall 2025 timeframe, the auction results exceeded MISO's Reserve Margin Requirement by 2.6%. That means MISO entered the fall with more resources than necessary to ensure grid reliability. Ex. H at 19.

Indeed, for Schahfer, the relevant IRP confirms that NIPSCO would "continue to complete and place in service wind, solar, and solar plus storage replacement resources previously approved by the Commission for the scheduled 2025 retirement of all coal units."[36]

And as the States' Petitions for Rehearing on the three Campbell Orders explain, the "elevated risk" designation that DOE cites is relatively common and has never presented an emergency before. And nothing in the NERC assessment determined that MISO's interconnection with other RTOs would be insufficient for additional capacity if needed. Nonetheless, the Orders to the Schahfer and Culley coal units rely on the NERC long-term assessment to claim that "additional dispatch" of the coal plants is "necessary." Exs. A-B at 2. DOE drew that improper

---

[36] *See, e.g.*, Integrated Resource Plan, NIPSCO 2024 Summary (accessible at https://www.nipsco.com/docs/librariesprovider11/rates-and-tariffs/irp/nipsco_2024-irp.pdf).

conclusion even though the retiring Schahfer and Culley plants were not included in any of the MISO forecasts finding sufficient capacity.

Fourth, the Orders misstate the conclusions of the PRA by cherry-picking reference to capacity offset while simultaneously acknowledging its conclusion that the results "demonstrated sufficient capacity" for the planning year, which covers 2025-2026. Exs. A-B at 2; contra Ex. H at 12 ("The 2025 PRA demonstrated sufficient capacity"). Sufficient capacity, by definition, is not an emergency.

Fifth, the summer of 2025 is instructive. Even in the peak-demand timeframe of June (Ex. M) and July (Ex. N.), when actual demand reached 120 GW on June 23, MISO had more than enough offered capacity: Ex R at 25, 33; Ex. S at 24, 32. This does not include more than 7000MW in headroom available to MISO beyond the offered capacity shown.[37] The Orders do not indicate that the December 23, 2025, through March 23, 2026, timeframe is likely to come anywhere near such demand, or that there would be insufficient capacity to meet it, or that the additional available headroom would not be enough to address any such demand.

Sixth, the Order cites MISO's attributes roadmap from December 2023. Exs. A-B at 2; Ex. T. But that document is not only relatively old compared to the other information DOE cites, it does not speak to the Winter of 2026. DOE notes that it refers to the potential for risk of loss of load in the summer fand fall beginning in 2027. The document does not support the existence of any emergency during the term of the Orders. *Id*. The Orders do not explain how a Section 202(c) order directed to Winter 2026 timeframe will address any emergency in that timeframe-the issue

---

[37] *See* Public Interest Organization's Petition for Rehearing submitted to DOE on September 8, 2025, Exhibit 70 at ¶¶ 16-19.

identified is not until 2027 at the earliest. And as discussed above, the most recent NERC winter assessment, applicable during the period of the Orders, does not foresee any such emergency.

Seventh, the Orders cite MISO's Response to the Reliability Imperative, concluding that MISO purportedly has "resource reliability concerns" and quotes a passage acknowledging "risks in non-summer months" that were not historically of concern. Ex. A-B at 2. But the Orders fail to identify how generalized discussion of non-summer "concerns" and potential "risks" demonstrate any particular emergency, much less a specific one that is posed for the Winter 2026 timeframe. To the contrary, the MISO Response to the Reliability Imperative describes the risks posed by non-summer operations in the context of explaining the steps it is taking to address these risks in order to ensure adequate capacity and overall system reliability. Ex. U at 11. It specifically describes four pillars of approaches that MISO intends to deploy, (Ex. U at 12-24), and concludes with a "Roadmap" for how it will deploy its strategy. Ex. U at Appendix A-1. The Orders do not contend that MISO's approach will adequate, or that there is an emergency despite MISO's robust efforts. *Id.*; *contra* Exs. A-B.

Eighth, the Orders again discuss the 2025-2026 PRA results, which included a statement that "new capacity additions were insufficient to offset the negative impacts of decreased accreditation, suspensions/retirements and external resources." Ex. A-B at 2-3; *contra* Ex H. Again, the actual document, in its full context, <u>confirms adequate margin</u> for reliability. *Id*.

Ninth, the Orders cites the Organization of MISO states and MISO's joint publication of a survey dated June 6, 2025. Exs. A-B at 3. But that survey confirms a <u>surplus</u> through the summer of 2026, well beyond the scope of the Orders' timeframe. In fact, the survey shows a fall 2026 surplus using seasonally-accredited capacity against the planning reserve margin requirement:

Ex. V at 21. The Orders rely on the survey results to identify potential forecast deficits (which are not emergencies) in the 2027-2030 timeframe—but that is well outside the Winter 2026 timeframe in which the Orders will be in effect, and fails to account for the "Emerging + Replacement Projection" metrics throughout the document showing surpluses against the projected Planning Reserve Margin Requirement. *Id*. at 7, 9, 19-26.

Tenth, Orders further cite Executive Orders directed to building out energy capacity and supporting artificial intelligence. But the Orders do not discuss how these Executive Orders demonstrate any inadequate approach to meeting the projected needs on MISO's system, much less one that presents an emergency of any sort.

In total, none of this evidence demonstrates that there is any emergency, much less one that might occur in the December 23, 2025, to March 23, 2026, timeframe. To be sure, there are normal capacity considerations including some that pose some degree of potential risk, but not one of the

32

sources cited in the Orders evidence any lack of adequate planning to address those risks, much less any likelihood of a shortfall between August 20 and November 19, 2025.

Instead, the robust and comprehensive planning processes undertaken by the prime authorities—the individual states, the utilities, and MISO—have comprehensively planned for resource adequacy and system reliability during the period of the Orders and beyond.

Given all of these countervailing considerations, and the full context of the sources that DOE purports to cite, DOE did not have substantial evidence supporting its emergency determination. It did not exercise reasoned decision-making in declaring that an emergency exists. The Orders compelling the Schahfer and Culley coal units to operate is arbitrary and capricious.

The States have already documented all of these flaws in three separate requests for rehearing on DOE's equally flawed orders compelling the J.H. Campbell plant to operate (DOE Orders 202-25-3, 202-25-7, and 202-25-9). These requests are hereby incorporated and adopted herein, including their discussion of materials not cited in the Orders subject to this request. These include the comments of Jennifer Curran and the MISO independent market monitor which DOE previously relied upon but has now dropped. The States' prior submissions put DOE on notice of the flawed analysis of its prior orders. Exs. W-X.

Rather than identifying and responding to an actual emergency, both the Orders demonstrate that DOE instead started with a desired result (keeping a coal-fired plant online), and worked backwards to justify that outcome.

**B.      The Orders exceed DOE's authority because they are not limited to a specific inadequate power supply situation as required by Section 202(c) and 10 C.F.R. § 205.371.**

DOE exceeds its authority because the Orders do not address any actual emergency or sudden occurrence needing imminent response, and because they have not identified any actual

and specific insufficient supply situation in the Winter 2026 timeframe. Thus the Orders are without authority and contrary to law.

As the statutes make clear, an actual "emergency" is a sudden occurrence requiring immediate responsive action; conversely, it is not the mere potential that an emergency might occur. 16 U.S.C. § 824a(c). And Department regulations define "emergency" to mean an unexpected inadequate supply of electric energy which may result from the unexpected outage or breakdown of facilities for the generation, transmission, or distribution of electric power. "Such events may be the result of weather conditions, acts of God, or unforeseen occurrences not reasonably within the power of the affected 'entity' to prevent." 10 C.F.R. § 205.371. Further, emergency orders must meet "a specific inadequate power supply situation," and although emergencies with extended periods of insufficient supply could qualify, the impacted entity is supposed to firm up commitments for supply "so that a continuing emergency order is not needed." *Id.*

These requirements have been demonstrated by DOE's historic use of 202(c) authority to address natural disasters and specific capacity crises. The most common reason to invoke Section 202(c) authority has been to address natural disasters like hurricanes, cold weather events, and extreme heat. *See* DOE Order Nos. 202-05-1 & -2 (Sept. 28, 2005) (Hurricane Rita); DOE Order No. 20208-1 (Sept. 14, 2008) (Hurricane Ike); DOE Order No. 202-20-1 (Aug. 27, 2020) (Hurricane Laura); DOE Order No. 202-24-1 (Oct. 9, 2024) (Hurricane Milton); DOE Order No. 202-21-1 (Feb. 14, 2021) (Winter Storm Uri); DOE Order No. 202-22-3 (Dec. 23, 2022) (Winter Storm Elliot – Texas ERCOT); DOE Order No. 202-22-4 (Dec. 24, 2022) (Winter Storm Elliot – PJM); DOE Order No. 202-20-2 (Sept. 6, 2020) (extreme heat in California); DOE Order No. 202-21-2 (responding to extreme heat, wildfires and drought in California); DOE Order Nos. 20222-1

34

& 2 and amendments (same). Indeed, during Winter Storm Elliot, MISO exported power to neighboring regions.[38]

Past practice further confirms the impropriety of these Orders. While DOE's emergency powers have occasionally been used to address retirements, it has done so only when requested by the operator or local government and there was a specific need demonstrated for the units to operate due to an unexpected emergency. DOE Order No. 202-05-3 (Dec. 20, 2005) (Mirant to supply Washington D.C. when transmission lines were out of service); DOE Order No. 202-17-1 at 2 (Grand River Energy to operate Unit 1 due to lighting strike to Unit 2 and delay in construction for Unit 3); DOE Order No. 202-17-2 (need to operate Yorktown to avoid imminent risk of load-shedding).

The plain text, prior regulatory interpretation, judicial precedent, and longstanding practice all confirm a limited power applicable only to sudden, imminent conditions. Context makes that all the more plain. *See Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000) (The "words of a statute must be read in their context and with a view to their place in the overall statutory scheme.").

A memorandum by the Congressional Research Service, Ex. Y, confirms that DOE's use of Section 202(c) to order coal plants to remain generally available is wholly novel. Ex. S at 3 (Department engaging in "seemingly new interpretations of the emergency authority"). That novelty violates well-settled law prohibiting agencies from asserting novel, transformational, and impactful authorities that congress did not intend.

---

[38] MISO, *Overview of Winter Storm Elliott December 23, Maximum Generation Event* (Jan. 17, 2023) ("*Winter Storm Elliott Overview*") at 7, https://cdn.misoenergy.org/20230117%20RSC%20Item%2005%20Winter%20Storm%20Elliott %20Preliminary%20Report627535.pdf.

The Orders impose a transformative and illegal use of section 202(c): as a means to intervene in the regulatory landscape, displacing both state law and sections 205 and 206 of the FPA, under which FERC regulates regional grid operators' resource adequacy requirements. Had Congress intended to vest such a broad power in section 202(c) it would have stated so clearly. Indeed, it defies logic that Congress would grant DOE general authority over which power plants may retire across the country—a function with profound implications for rates, state sovereignty, and a broad array of stakeholder interests—without any obligation to assess the effect on ratepayers or seek public input.

The Supreme Court has emphatically rejected statutory interpretations whereby an agency "claim[s] to discover in a long-extant statute an unheralded power representing a transformative expansion in its regulatory authority." *W. Virginia v. Env't Prot. Agency*, 597 U.S. 697, 724-25 (2022) (internal quotations omitted); *cf. Whitman v. Am. Trucking Associations*, 531 U.S. 457, 468 (2001) ("Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions . . . ."). Yet what DOE issued here is exactly that "extraordinary case[]," *W. Virginia*, 597 U.S. at 721 (cleaned up): the discovery—in a 90-year-old statutory provision used seldomly and only for limited purposes—of unheralded yet broad authority to transform the regulatory environment underpinning the electricity system by commanding the amount and type of generation on the grid. All without "clear congressional authorization," *id*. at 724, and notwithstanding that such authority has been reserved to and exercised by the States and, at their election, RTOs, for decades. *Cf. Biden v. Nebraska*, 600 U.S. 477, 501 (2023) ("The question here is not whether something should be done; it is who has the

36

authority to do it"); *W. Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring) (agency overreach "also risks intruding on powers reserved to the States").

Indeed the statutory structure of the federal power act confirms the short-term nature of emergency approaches. That is because long-term planning authority appears in an entirely different Section of the Federal Power Act – Section 215—which indicates that the emergency authority of Section 202(c) is a different authority altogether. 16 U.S.C. § 824o. Given all of the procedures attendant to resource planning, this statutory structure confirms that emergency orders are not the proper mechanism to engage in resource planning five years into the future. *See FDA v. Brown & Williamson Tobacco Corp*., 529 U.S. 120, 142 & 149 (2000); s*ee also Cal. Indep. Sys. Operator Corp. v. FERC*, 372 F.3d 395, 401–02 (D.C. Cir. 2004) (DOE's authority in one Section of the Federal Power Act "is strong evidence" that a separate Section does not confer the same authority on the agency).

Courts have also recognized Section 202(c)'s limitation to actual or imminent crises. For example, in *Richmond Power and Light v. FERC*, the D.C. Circuit noted that the statute "speaks of 'temporary' emergencies, epitomized by wartime disturbances, and is aimed at situations in which demand for electricity exceeds supply." 574 F.2d 610, 615 (D.C. Cir. 1978). And in *Otter Tail Power Co. v. Fed. Power Comm'n*., the Eighth Circuit noted that 202(c) provides authority to "react to a war or national disaster and order immediate interconnection. . . to maintain electrical service during such emergency." 429 F.2d 232, 234 (8th Cir. 1970). In *Otter Tail*, the Eighth Circuit distinguished between an emergency that is likely to occur and one that is actually

occurring, concluding that a separate provision, section 202(b)[39] applies to the former, while

section 202(c) applies to the latter:

> On its face, § 202(c) enables the Commission to react to a war or national disaster and order immediate interconnection of the facilities to maintain electrical service during such emergency. . . On the other hand, § 202(b) applies to a crisis which is likely to develop in the foreseeable future but which does not necessitate immediate action on the part of the Commission.

*Otter Tail Power Co.*, 429 F.2d at 234. In that case, a power company challenged the FPC's order

issued under § 202(b) of a temporary connection between the power company and a small

municipally owned power producer that was "dangerously close to eroding its firm power supply"

due to the proximity between the generator load capacities and the peak load demand. *Id.* It claimed

that because the ordered connection was temporary, the order could only be issued under section

202(c), and only in emergency conditions. *Id.* The court disagreed that section 202(c) only applies

to temporary orders but agreed that a potential crisis in the foreseeable future was not an

emergency, making it "just the type of situation to fit into a § 202(b) hearing rather than § 202(c)."

*Id.* The caselaw is therefore clear—emergency orders cannot be used to address longer-term

potential future risks that are properly addressed through ordinary planning approaches.

---

[39] Section 202(b) refers to 16 U.S.C. § 824a(b), which states "[w]henever the Commission, upon application of any State commission or of any person engaged in the transmission or sale of electric energy, and after notice to each State commission and public utility affected and after opportunity for hearing, finds such action necessary or appropriate in the public interest it may by order direct a public utility" if the utility would not face an undue burden. The DOE's authority is much more limited in these situations. Further, 42 U.S.C. § 7172(a)(1)(B) vests this power in FERC, not the Secretary.

Statutory text and structure, past practice, and caselaw are therefore all clear: for DOE to have any authority under section 202(c), the emergency must be actual and not merely a broadly asserted future risk. With no such actual or imminent emergency, the Orders are unlawful.

### C.     The Orders exceed DOE's authority because they requires actions not listed in Section 202(c)(1).

The Orders are unlawful because they purport to require actions not within DOE's statutory authority.

DOE's authority is limited to issuing orders that require connections or the generation, delivery, interchange, or transmission of electric energy. 16 U.S.C. § 824a(c). This authority does not cover mandating general plant <u>availability</u> untethered to meeting any specific need, nor does it allow for <u>potential</u> economic dispatch (which is not an apt solution for an actual emergency anyway—more on this in Section G below). Section 202(c)(1) does not allow for preemptive measures just in case an emergency might occur, and specifically does not allow for the Department to order availability without a specific need to be available.[40] Plus, "economic dispatch" is not equivalent to the generation of electric energy. Economic dispatch is constrained by statute to mean <u>only</u> the lowest-cost option under the Energy Policy Act of 2005 Section 1234(c). 42 U.S.C. §16432(b). MISO's determination of lowest-cost sources may not result in the Schahfer or Culley coal units producing *any* generation whatsoever during the Winter 2026

---

[40] Before these two Orders and the three Campbell orders, DOE had issued Section 202(c) emergency orders only 19 times in history. Only once, for Mirant in 2005, did it require a plant to supply as-needed additional capacity—but even then it was based on a specific application demonstrating a concrete and specific need. DOE Order No. 202-05-3 (Dec. 20, 2005). That is not the case here.

timeframe. (Or if it does, it could be as a result of the Orders rather than an external need.) Thus, the Orders are without authority and contrary to law.

> **D.     The Orders exceed DOE's authority because they do not set hours of operation, limit hours of operation, or minimize environmental impact as required by Section 202(c)(3).**

Any emergency order issued under Section 202(c) must be limited to only those hours necessary to meet the emergency. 16 U.S.C. § 824a(c)(2).

But the Orders at issue here address only the <u>potential</u> for an emergency, they do not identify a need for the Schahfer or Culley coal units to generate electricity to meet it. By the same token, the Orders do not establish any limited hours or other parameters for the Schahfer or Culley coal units to follow to ensure their usage is what actually meets the purported emergency, only that they be available at all times. Thus the Orders are without authority and contrary to law, and allow the Schahfer and Culley coal units to generate electricity during times there are not even "elevated risks." Allowing a coal plant to generate electricity and pollute beyond the purported emergency needs would increase the environmental impacts that, by law, the Orders must strive to minimize. 16 U.S.C. § 824a(c)(2). Thus the Orders are without authority and contrary to law.

> **E.     The Orders exceed DOE's authority because Section 201(b)(1) reserves decisions about plant retirements to the states.**

Section 201(a) of the Federal Power Act explicitly provides that federal regulation over generation and transmission is related to matters of interstate commerce and extends "only to those matters which are not subject to regulation by the States." 16 U. S. C. § 824(a). Decisions over what plants should be constructed or retired is traditionally subject to state regulation. States retain jurisdiction "over facilities used for the generation of electric energy." 16 U.S.C. § 824(b)(1). "The states are thus authorized to regulate energy production . . . and facilities used for the generation of electric energy" *Coal. for Competitive Elec., Dynergy Inc. v. Zibelman*, 906 F.3d 41, 50 (2d Cir.

40

2018). What facilities to build, whether they remain feasible, and utility rates are areas governed by the states. *Pac. Gas & Elec. Co. v. State Energy Res. Conservation and Dev. Comm'n*, 461 U.S. 190, 205 (1983).

The energy market is governed by longstanding principles of cooperative federalism encouraged in Section 209(b) of the Federal Power Act—which explicitly declares that the Federal Energy Regulatory Commission may consult with states "regarding the relationship between rate structures, costs, accounts, charges, practices, classifications, and regulations of public utilities subject to the jurisdiction of such State commission and of the Commission.") 16 U.S. Code § 824h(b). Indeed, FERC has embraced these cooperative federalism principles and developed long-standing consultation practices with the states, including through creation of a Joint Federal-State Task Force. Ex. T. And more recently, a Federal-State Current Issues Collaborative. Ex. U.

Section 103 of the Department of Energy Organization Act, also applicable, mandates due consideration to state retirement plans and requires, where practicable, consultation with relevant state officials. 42 U.S.C. § 7113.

States are responsible for developing and approving power generation plans, typically through public commissions like the Public Utilities Commission[41] in Minnesota, the Wisconsin Public Service Commission, and the Indiana Utility Regulatory Commission (IURC).[42] These bodies oversee the development of Integrated Resource Plans ("IRPs"), or Strategic Energy Assessments, which are the blueprints for how a utility plans to generate sufficient electric power to meet its expected demand. *E.g.*, Minn. Stat. § 216B.2422 (Minnesota's IRP statute). An IRP can

---

[41] Minnesota Public Utilities Commission, *Utility Planning*,
https://mn.gov/puc/activities/economic-analysis/planning/ (last visited June 23, 2025).
[42] Wis. Stat. Ann. § 196.491 (West).

consider and adopt plans with myriad inputs and considerations and impact overall electricity rates, the specific communities or areas where power plants are located, determinations of which power plants might be built or retired and the fuels that they will use, overall electric system reliability (like the likelihood of power outages and how quickly the lights come back on), and the environment.[43] Such processes can be rigorous and commissions will open a docket to publicly vet a proposed plan, receive comments, and make an informed decision that is in the best interest of the states and its ratepayers.[44] As discussed above, the planned retirements of the Schahfer and Culley units at issue were subject to such a process before the IURC.[45]

MISO, in turn, is one of the country's largest regional transmission organizations (RTOs), which were formed to develop transmission systems, trading markets, and attendant procedures.[46] MISO works collaboratively with its member states to ensure resource adequacy throughout its service area.[47] This means that it ensures there is sufficient generation capacity to meet future electricity demands, including forecasting demand growth, assessing existing generation assets, and planning for new generation resources.[48] MISO works with utilities during their development of submissions to state regulators for the IRPs that that the regulators ultimately approve. And

---

[43] *Id.*

[44] Minnesota Public Utilities Commission, *Electric Integrated Resource Planning (EILRP)*, https://mn.gov/puc/activities/economic-analysis/planning/irp/ (last visited June 23, 2025).

[45] *See, e.g.*, Complaint and Request for Fast Track Processing of Northern Indiana Public Service Company LLC, FERC Docket EL26-36-000 at 7 (December 29, 2025) ("NIPSCO's 2021 Integrated Resource Plan ("IRP") included a retirement analysis to assess retirement dates for different generating units of its existing generation fleet"); *See also, e.g.*, Complaint Requesting Fast Track Processing, FERC Docket EL26-38-000 at 9 – 10 (January 5, 2026).

[46] FERC, *Energy Primer*, https://www.ferc.gov/sites/default/files/2024-01/24_Energy-Markets-Primer_0117_DIGITAL_0.pdf

[47] MISO, *System Planning*, https://www.misoenergy.org/meet-miso/about-miso/industry-foundations/grid_planning_basics/ (last visited June 23, 2025).

[48] *Id.*

MISO then accounts for the final IRPs in its planning and analyses forecasting the balance between load and capacity. MISO also operates a capacity auction where utilities and other load-serving entities can procure the necessary generation capacity to meet projected demand. This incentivizes the development and maintenance of adequate generation resources.[49] MISO works with utilities, local regulators, and other stakeholders to maintain resource adequacy, including through its annual PRA, which procures sufficient resources and allows market participants to buy and sell capacity via an auction. MISO determines the capacity requirements in its region for each season covering the June 1 to May 31 time period.[50]

The Schahfer and Culley coal units' planned retirement is subject to precisely such state regulation and MISO integration. The plan to retire the plant received intense scrutiny over years before being approved and worked into MISO's projections—all under the auspices of state law including Indiana's IRP processes, state regulatory proceedings, state judicial proceedings, and state participation in MISO. MISO also reviews planned plant retirements to ensure resource adequacy and grid reliability. Section 38.2.7 of MISO's Open Access Transmission, Energy, and Operating Reserve Markets Tariff requires an operator to provide 26 weeks of advance notice of a planned retirement. MISO then performs a Reliability Study to determine whether the retirement will pose any concern for grid reliability. [51]

Both CenterPoint and NIPSCO submitted relevant Attachment Y forms to provide notice that they planned to suspend generation at these plants. MISO approved of such retirements. Ex.

---

[49] *Id*.

[50] MISO, *Resource Adequacy*, https://www.misoenergy.org/planning/resource-adequacy2/resource-adequacy/#t=10&p=0&s=FileName&sd=desc (last visited June 23, 2025).

[51] If MISO does identify a threat to grid reliability if the resource retires, the MISO tariff provides a mechanism to retain that resource until the constraint can be alleviated.

E. In making its approval, MISO determined that such retirements "would not result in violations of applicable reliability criteria." Ex. E at 9.

DOE did not adequately consult with the States, much less account for or incorporate the findings of MISO when it approved these Attachment Y submissions. The Orders are wholly silent as to any consultation with the State of Indiana in which all three coal units are located. Yet State regulators have primary jurisdiction over IRPs, siting, and cost recovery for utilities operating in their states. *Zibelman*, 906 F.3d at 50. DOE's failure to consult violates the principles behind FERC and DOT policies to involve the states in light of the statutory reservation of state authority in federal-state regulatory balance, 16 U.S.C. § 824(b)(1). It avoids 209(b) of Federal Power Act regarding federal-state collaboration and upends FERC's historic practice of seeking to develop a robust dialogue between regulators. 16 U.S. Code § 824h(b). And it flouts Section 103 of the Department of Energy Organization Act which requires consultation with relevant state officials — consultation was absolutely "practicable" here given the lack of an imminent emergency. The Orders did not give any consideration (much less due consideration) to Indiana's IRP in violation of law. 42 U.S.C. § 7113.

In the Orders' focus on longer-term risks, including the growth of data centers and the projections out into the 2027-2030 timeframe, DOE is improperly inserting itself into long-term resource planning, usurping a role belonging to the respective states and MISO. The DOE cannot use short-term emergency orders to serve a purpose for which DOE's emergency authority was not designed: to supplant the states' primary authority in the long-term resource planning arena, or to reject the carefully considered work that MISO puts into planning resources.

The Orders usurp the States' and MISO's primary rule in resource planning and development; it is contrary to law.

**F.      The Orders are unreasoned, arbitrary, and capricious because their directive for "economic dispatch" is inherently contradictory with the needs to meet an actual emergency.**

Section 202(c) contemplates emergency orders that are tailored to the specific emergency—they must "best meet the emergency and serve the public interest." 16 U.S.C. § 824a(c). Even if an emergency did exist and DOE had the legal authority to issue an order, these two Orders are not rationally related to address the emergency that the Orders identify.

The Orders' specific requirement for MISO to take steps to effectuate "economic dispatch" of the Schahfer and Culley coal units undermines their determination that an emergency exists and cannot "best meet" the purported emergency. Economic dispatch is a term of art for the procedure by which MISO selects generators to add electric energy to the grid. It is designed to ensure that the electricity generated matches the demand in its service area in the most cost-effective way. "Economic dispatch," by definition, is awarded to the lowest-cost option (all else being equal). Ex. Z. That is because much of the base load planning takes place years or months ahead of time and is comprised of the must-run units. Additional capacity is then called upon in the day-ahead or day-of markets for which additional generation is required:

**Figure 2-2: Demand Response and Energy Efficiency in Electric System Planning and Operations**

Price-Based Demand Response

energy efficiency | time-of-use rates | day-ahead hourly pricing (RTP) | real-time hourly pricing (RTP)/CPP

load commitment timescales

power & load reduction delivery

years system planning | months operational planning | day-ahead economic scheduling | day of economic dispatch | <15 min

capacity/ancillary services programs | demand bidding/ buyback | emergency programs | interruptible programs | direct load control

Incentive-Based Demand Response

Source: U.S. Department of Energy[82]

Ex. Z at 43. Most of the generation available to meet load in real time for economic dispatch is identified and scheduled the day before, based upon the day-ahead load forecast used in the security-constrained unit commitment process. Ex. AA at 6-7, 13, 51. As recently as 2021, the vast majority of peaking plants operated on natural gas and oil which can be dispatched in much shorter order; only 3.3 percent of all peakers nationwide burned coal. See Ex. BB at 2.

Taken together, economic dispatch considers a variety of factors including (1) the cost of generation, (2) the standby condition of the generator, (3) ramp-up time to provide the needed capacity, and (4) whether electric energy can be transmitted to the area of need.

The Orders' proposed solution for "economic dispatch" of the Schahfer and Culley coal units is thus inherently incompatible with addressing emergency operation (likely because there is no emergency in the first place). In a true emergency, even <u>uneconomic</u> plants receive cost-of-

service payments when they are required to run to alleviate the emergency condition. The RTO does not require the emergency generator to bid into the market and *then* make a determination about whether it will be selected to run as with economic dispatch. Rather, the emergency generator becomes a "price taker" using MISO's "must run" classification.  Thus, the Orders' directive to use "economic dispatch" is irrational: actual emergencies are not addressed with economic dispatch, and economic dispatch is a necessarily ineffective method to address an actual emergency.[52]

Moreover, the Orders' requirement that the Schahfer and Culley coal units be "available to operate" does not accord with 202(c)(1)'s requirement that DOE select the temporary measure that will "best meet the emergency and serve the public interest."  Section 202(c)(1)'s use of the term "best" shows that the Commission cannot require temporary power generation from the Schahfer and Culley coal units when better means are available to meet the alleged emergency and serve the public interest. *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009) ("Best" means what is "most advantageous." (Quoting Webster's New International Dictionary 258 (2d ed.1953))).  DOE's decision to require the plants to be available disregarded its obligation to consider alternatives and select the best one.

Although DOE need not consider every conceivable alternative, it must consider those that are obvious and viable. *See Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 591 U.S. 1, 30 (2020); *Motor Vehicle Manufs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 51 (1983); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013).

---

[52] Campbell's situation illustrates this inefficiency. Coal is an expensive fuel type in our current energy mix. The inefficiency of running a coal plant makes it uneconomic in general, which is one of the reasons why this specific Campbell plant was slated for retirement. *See In re Application of Consumers Energy*, No. U-21090, 2022 WL 2915368, at *73.

Intervenors and the public may also introduce information that requires the Department to evaluate alternatives and reconsider its decision to impose or maintain a requirement. *See, e.g.*, *Chamber of Com. of the U.S. v. Secs. & Exch. Comm'n*, 412 F.3d 133, 144 (D.C. Cir. 2005) (evaluating agency failure to consider alternative raised by dissenting Commissioners and introduced by commenters); *cf.* 10 C.F.R. § 205.370 (stating ability to cancel, modify, or otherwise change an order). Indeed, DOE's regulations specify information it shall consider when deciding to issue an order under section 202(c). 10 C.F.R. § 205.373. The specified information includes "conservation or load reduction actions," "efforts . . . to obtain additional power through voluntary means," and "available imports, demand response, and identified behind-the-meter generation resources selected to minimize an increase in emissions." *Id*. § 205.373(g)–(h); Ex. CC at 4 (DOE Order No. 202-22-4). DOE has not explained why ordering the Schahfer and Culley coal units to remain "available" meets any of these criteria, especially in light of alternatives such as power pooling and utility coordination.

Even if there were an emergency, DOE has not explained why its Orders "best" meets the emergency. That is because they do not. Again, the Orders allege only that the Schahfer and Culley coal units should remain available because a need for additional capacity *might* arise in the future (and even then, most likely years from now, not in the Winter 2026 timeframe). Given the speculative nature of the alleged emergency, it is incorrect as a matter of fact that ordering the Schahfer and Culley coal units to remain available is the best means of addressing it. DOE's failure to consider alternatives other than the inefficient and incapable Schahfer and Culley coal units does not meet section 202(c) requirement for DOE to use its judgment to choose the best temporary source of emergency energy.

First, if an emergency need occurs in the day-of or real-time markets, the Schahfer and Culley coal units will not be able to spool up in time to meet that need. That is because it takes hours or days for coal plants like Schahfer and Culley coal units to reach peak load.[53]

Second, even if there were adequate notice for the Schahfer and Culley coal units to deliver energy in an emergency, their age and unreliability make them a poor choice to rely on for emergency services.[54] Their age and need for repair/maintenance were key among the reasons they were slated for retirement.

Third, even if there were adequate transmission and lead time, the Schahfer and Culley coal units use an expensive fuel source, which means that their bid to provide electricity would be higher than other lower-cost dispatchable alternatives (natural gas, storage, or renewables), which would prevent it from being selected as the most economic resource to meet the need. The Schahfer units are together responsible for a maximum of 847MW of nameplate generation (when they are operational and capable of achieving peak load).[55] Schahfer Unit 18 is not even available to run during the timeframe of the Orders; and Culley Unit 2 is responsible for only 100 MW. *Id*. That represents a small fraction of the remaining margin that MISO had available in the summer of 2025 and demonstrates that these coal plants are not an efficient means of meeting an emergency energy demand.

---

[53] *See* Forms EIA-860 and EIA923, *available at* https://www.eia.gov/electricity/data/eia860/; https://www.eia.gov/electricity/data/eia923/.

[54] *See* Public Interest Organization's Petition for Rehearing submitted to DOE on September 8, 2025, Exhibits 103-104.

[55] *Sourced from* https://campd.epa.gov/data/custom-data-download

Finally, if, for example, there were a need for additional electricity in North Dakota in March of 2026, it is unlikely that there would be sufficient transmission infrastructure across the Great Lakes to deliver electricity from the Schahfer and Culley coal units to meet that need.

Rather than order the Schahfer and Culley coal units to remain available, DOE was required to consider obvious alternatives that MISO has available and uses as part of its role as a regional transmission grid operator. The Department has long recognized that power pools and utility coordination "are a basic element in resolving electric energy shortages." *Emergency Interconnection of Elec. Facilities and the Transfer of Elec. to Alleviate an Emergency Shortage of Elec. Power,* 46 Fed. Reg. 39,984, 39,985–86 (Aug. 6, 1981). And recent history bears out the important role of transmission connectivity along with imports and exports.[56]. The fact that DOE has intruded on MISO's role of planning for and meeting fluctuations in demand without considering these viable and obvious alternatives shows that it did not comply with section 202(c).

Section 202(c)(2) requires the emergency measures to be tailored the actual need; yet here, the Orders improperly impose measures that are not tailored to anything. All the while, the Orders impose costs on the States to bring the Schahfer and Culley coal units to operational status beyond their planned retirements, add potentially expensive generation to the mix if the Schahfer and Culley coal units were to run in the Winter 2026 timeframe, and generate harmful pollution at the

---

[56] *See, e.g.*, Public Interest Organization's Petition for Rehearing submitted to DOE on September 8, 2025, Exhibit 43 at § III.A.3.b (Winter Storm Elliott System Operations Inquiry) ("Despite tightening conditions on the MISO system . . . MISO maintained steadily increasing exports to TVA throughout the day."); Exhibit 44 at 43 (PJM Elliott Report) (describing PJM exports of between 8 and 11 GW to TVA and other neighboring regions), 83–84 (describing PJM power exports to MISO and graphically depicting those exports over time); Exhibit 36 at 6 (MISO Elliott Max. Gen. Event Overview) ("MISO consistently exported power to southern neighbors with a maximum value of nearly 5 GW."); *and* Exhibit 7 at 1 (DOE Order No. 202-02-1) (providing for usage of interregional transmission).

same time. Thus, the Orders requiring the Schahfer and Culley coal units to remain available and for MISO to take steps to use the Schahfer and Culley coal units for economic dispatch is irrational and arbitrary where the Schahfer and Culley coal units are unlikely to be a good candidate to serve either economic dispatch or emergency-need functions—especially where it is unclear what need they is supposed to meet in the first place.

Therefore, the Orders are not rationally related to meeting the need of the purported emergency that they identify.

### G.    The purported emergency is pretext for a prejudged outcome.

The two Orders are not a good faith effort to carry out DOE's duties under the Federal Power Act. Rather, the materials supporting the Orders demonstrate a pretextual effort to further the administration's policy support for fossil fuels, and in particular coal electricity generation.

Where the conduct of the agency shows an "unalterably closed mind on matters critical to the disposition of th[is] proceeding," it requires either disqualification of the administrator or withdrawal of the proposal. *Ass'n of Nat'l Advertisers v. FTC*, 627 F.2d 1151, 1170 (D.C. Cir. 1979); *Nehemiah Corp. of Am. v. Jackson*, 546 F.Supp. 2d 830, 847 (E.D. Cal. 2008) (describing the appropriate remedies when an agency official has prejudged the outcome of a particular matter). A preexisting internal directive to reach a particular result is strong evidence that the official is not "free, both in theory and in reality, to change his mind" in the agency proceedings. *Nat'l Advertisers*, 627 F.2d at 1172; *see Int'l Snowmobile Mfrs. Ass'n v. Norton*, 340 F. Supp. 2d 1249, 1260 (D. Wyo. 2004).

The Orders cite to a bevy of Executive Orders declaring an energy emergency. Even if these Executive Orders are taken at face value, they are incoherent with the President's other actions to <u>reduce</u> capacity of new energy generation, such as from ongoing and nearly-completed

wind projects. *Temporary Withdrawal of All Areas on the Outer Continental Shelf From Offshore Wind Leasing and Review of the Federal Government's Leasing and Permitting Practices for Wind Projects* 90 Fed. Reg. 8,363 (Jan. 20, 2025); *Ending Market Distorting Subsidies for Unreliable, Foreign-Controlled Energy Sources*, 90 Fed. Reg. 30,821 (Jul. 10, 2025).

Further, the administration has declared a preference for coal energy. *Executive Order 14261: Reinvigorating America's Beautiful Clean Coal Industry and Amending Executive Order 14241*, 90 Fed. Reg. 15,517 (Apr. 8, 2025). The express mandate of Executive Order 14261 declared it to be the national policy "to support the domestic coal industry by removing Federal regulatory barriers that undermine coal production, encouraging the utilization of coal to meet growing domestic energy demands, increasing American coal exports, and ensuring that Federal policy does not discriminate against coal production or coal-fired electricity generation."

But this was not a simple policy preference—the administration had already predetermined that it would resort to emergency authority to reopen or forestall closure of coal plants before it ever issued these Orders. On April 8, 2025, President Trump gave remarks during the signing ceremony for Executive Order 14261. In those remarks, he noted that the administration would take action to reopen coal plants.[57] Also on April 8, 2025, the Department of Energy announced several initiatives directed to increasing coal production.[58]

---

[57] https://www.presidency.ucsb.edu/documents/remarks-domestic-coal-production ("And all those plants that have been closed are going to be opened if they're modern enough." And "From now on, we'll ensure that our Nation's critically needed coal plants, as an example, remain online and fully operational. They're always going to be operational.")

[58] https://www.energy.gov/articles/energy-department-acts-unleash-american-coal-strengthening-coal-technology-and-securing

During a Bloomberg TV interview in February 2025, Secretary Wright declared that the United States should stop the closure of coal power plants, and asserted that DOE had the authority to do so.[59]

On July 7, 2025, Secretary Wright was quoted as saying, "I think our biggest impact by far is going to be — there are like 40 coal plants that are supposed to close this year — and our biggest impact is going to be to stop the closure of most of those."[60]

On July 11, 2025, the DOE posted a video Secretary Wright to the department's social media accounts with the chyron, "BIG BEAUTIFUL CLEAN COAL. This is the largest source of global electricity and third largest source of electricity in the U.S."[61]

The DOE's social media feeds are full of clips from Secretary Wright media appearances extoling coal plants, promising to increase the use of coal for energy production, and asserting that DOE had the authority to forestall closures.

The administration, and DOE in particular, engaged in prejudgment of the Orders. Knowing that it needed to effectuate the administration's policy preference to keep coal plants open, DOE worked backwards from that preferred result and justified it using post-hoc rationalizations. Secretary Wright demonstrated an "unalterably closed mind on matters critical to the disposition" of the use of emergency authority, requiring the Orders to be set aside. *Nat'l Advertisers*, 627 F.2d at 1170; *Nehemiah Corp.*, 546 F.Supp. 2d at 847.

---

[59] https://www.bloomberg.com/news/articles/2025-02-11/us-should-stop-closure-of-coal-fired-power-plants-wright-says.

[60] https://www.wvnews.com/statejournal/news/top_story/energy-secretary-chris-wright-future-of-u-s-coal-is-long-and-bright/article_4ffcdad0-9030-4e6f-8ca7-0816e1786cbc.html

[61] *E.g.*, https://www.facebook.com/energy/videos/big-beautiful-clean-coal-this-is-the-largest-source-of-global-electricity-and-th/1468968367585884/.

**CONCLUSION**

For all of the foregoing reasons, the Department should rescind the Orders directing Schahfer and Culley coal units to operate.

**KEITH ELLISON**
**ATTORNEY GENERAL**
**OF MINNESOTA**

*/s/ Peter Surdo*
Peter Surdo
Cat Rios-Keating
Alyssa Bixby-Lawson
*Special Assistant Attorneys General*
Office of the Minnesota Attorney General
445 Minnesota St., Suite 600
St. Paul, MN 55101

Dated: January 22, 2026

**KWAME RAOUL**
**ATTORNEY GENERAL OF**
**THE STATE OF ILLINOIS**

/s/ *Samuel C. Lukens*
Jason James, Special Assistant Attorney General
Office of the Illinois Attorney General
115 South LaSalle, 25th Floor
Chicago, Illinois 60603

Dated: January 22, 2026

**DANA NESSEL**
**MIGHICAN ATTORNEY GENERAL**

*/s/ Lucas Wollenzien*
LUCAS WOLLENZIEN (P86928)
MICHAEL E. MOODY (P51985)
Assistant Attorneys General
Special Litigation Division
P.O. Box 30755
Lansing, MI 48909
517-335-7627
MoodyM2@michigan.gov
WollenzienL@michigan.gov

Dated: January 22, 2026

# Exhibit C

## (Denial of Rehearing
## By Operation of Law)

**UNITED STATES OF AMERICA**
**Department of Energy**
Washington, DC 20585

Midcontinent Independent System Operator, Inc.          Order No. 202-25-12A
and Northern Indiana Public Service Company
Regarding the R.M. Schahfer Generating Station (Schahfer)

## NOTICE OF DENIAL OF REHEARING BY OPERATION OF LAW AND PROVIDING FOR FURTHER CONSIDERATION
(February 23, 2026)

Rehearing has been timely requested of the Department of Energy's order issued on December 23, 2025, in the above-captioned matter.[1]  Thirty (30) days having passed from the date on which rehearing requests were filed, the requests for rehearing are deemed denied by operation of law.[2]

As provided in 16 U.S.C. § 825*l*(a) and 16 U.S.C. § 824a(c), the requests for rehearing of the above-cited order may be addressed in a future order.[3]

_____

Chris Wright
Secretary of Energy

---

[1] *Midcontinent Indep. Sys. Operator, Inc. and N. Ind. Pub. Serv. Co LLC*, Order No. 202-25-12 (2025) (regarding the Schahfer Generating Station).

[2] 16 U.S.C. § 825*l*(a).

[3] 16 U.S.C. § 825*l*(a) (DOE may modify or set aside its above-cited order, in whole or in part, in such manner as it shall deem proper); 16 U.S.C. § 824a(c) (DOE may issue a supplemental order).

Controlled by: The U.S. Department of Energy, DOECUI@hq.doe.gov